UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>           v.<br><br>NICO BURRELL,<br>Defendant. | CRIMINAL NO. 15-Cr-95 (AJN) |

<u>SENTENCING MEMORANDUM</u>

Judith Vargas, Esq.
The Law Offices of Judith Vargas
20 Vesey Street
Suite 400
New York, NY 10007
Tel:   (212) 668-0024
Fax:   (212) 668-0060
Email:   <u>judithvargas1@aol.com</u>

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>NICO BURRELL,<br>Defendant. | CRIMINAL NO. 15-Cr-95 (AJN) |

<u>SENTENCING MEMORANDUM</u>

HON. ALISON J. NATHAN
United States District Judge
Southern District of New York

TO THE HONORABLE COURT:

## Introduction

Over the past (thirteen) years, federal sentencing has shifted dramatically, providing greater opportunities for lawyers, judges, and probation officers to help justice-involved individuals reduce their risk of recidivism by formulating a correctional treatment plan and giving judges more options to consider shorter prison terms and community corrections rather than lengthy periods of incarceration. Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), federal judges must impose a sentence that complies with 18 U.S.C. § 3553(a). Section 3553(a)(2) sets forth four purposes of sentencing: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter."[1]

This Sentencing Memorandum underscores these purposes of sentencing by identifying Mr. Burrell's strengths in order to formulate a plan that continues to improve his likelihood of success in community living.

Nico Burrell is scheduled to appear before this Honorable Court for his Sentencing Hearing on April 3, 2016, at 3:00 p.m. Mr. Burrell respectfully submits this Sentencing Memorandum with related exhibits, including video-recorded statements of immediate family members and colleagues, and a Mitigation Sentencing Report prepared by Sentencing and Mitigation Specialist, Kathleen O'Boyle, to

---

1. Denise C. Barrett, J.D., M.S.W., National Federal Defender Sentencing Resource Counsel, Formulating a Correctional Treatment Plan in Keeping with the Purposes of Sentencing. Available at https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/formulating-a-correctional-treatment-plan.pdf.

U.S. v. Nico Burrell, 15-Cr-95 (AJN)
Case 1:15-cr-00095-AJN   Document 2127   Filed 03/27/18   Page 3 of 13
Defendant Sentencing Memorandum
March 27, 2018
P a g e | 2

provide the Court with pertinent sentencing related information pursuant to FED. R. CRIM. P. 32, and 18, United States Code § 3661, and to highlight Mr. Burrell's strengths in order to assist the Court in formulating a sentence that will continue to further his likelihood of success in the community. This information is provided in support of a non-Guidelines sentence of 100 months plus credit for the prison time that Mr. Burrell has already served on a related conviction, and one year on supervised release. Mr. Burrell's limited role in the offense,[2] his time of incarceration served for related conduct in this case and his extraordinary rehabilitation prior to and during his incarceration the past two years on the instant offense merit such a sentence.

## Background Information, Procedural History, Charges and Penalties

On April 27, 2016 Mr. Burrell was arrested and charged in a five count indictment charging racketeering conspiracy, conspiracy to possess and distribute narcotics, and weapons charges. Pre-Sentence Report ("PSR"), ¶¶ 1-5. On August 16, 2017, Mr. Burrell pleaded guilty to Count 1 of the indictment, racketeering conspiracy, in violation of Title 18, United States Code § 1962(d). The penalty for this charge is a maximum sentence of 20 years' incarceration. PSR, p. 36.

## The PSR Recommendation

The final PSR prepared by Mr. James Mullen of the U.S. Department of Probation was received on December 29, 2017. The PSR recommends that Mr. Burrell receive a sentence of 110 months with credit for a Section §5K2.23 downward departure – to which the government does not object[3] -- for the five and one-half year sentence Mr. Burrell completed, followed by three years' supervised release. PSR, pp. 8, 36-37, "Sentence Recommendation," "we believe a variance is appropriate . . . [.]" The original PSR recommendation was 168 months.[4] We agree with the justification in the PSR's recommendation; this is a serious offense, and such a sentence takes into account Mr. Burrell's conduct, as well as the "unfortunate" and incredibly "negative influences in his immediate and proximate family." PSR, p. 37, *see also* Mitigation and Sentencing Report, pp. 4-7, "Nico Burrell's Personal and Family Background." For the reasons discussed extensively below and in Ms. O'Boyle's comprehensive report, we believe that a sentence of 100 months with the §5K2.23 departure credit for the five and one-half years that Mr.

---

2. *See* Sentencing Report by Kathleen O'Boyle, MSW, MSW, former U.S. Probation and Pretrial Services Officer and Mitigation Specialist, discussing Mr. Burrell's "lesser" and "limited role." "It does appear though, given Mr. Burrell's plea agreement, the sentencing recommendation in the PSR, and the verified fact that Mr. Burrell was nearly destitute and homeless for two years prior to his arrest, that Mr. Burrell played a lesser role than originally alleged." *Id.,* at 3-4, 7. This conclusion is based upon Ms. O'Boyle's full investigation, which included interviews of individual family members and supported by records relating to Mr. Burrell's background, including the PSR; the indictment; the plea agreement; NYPD and Bronx District Attorney's Office records relating to Mr. Burrell's 2009 arrest and conviction; ACS records; his New York City and State and Bureau of Prisons (BOP) detention and incarceration records; and Mr. Burrell's New York State Division of Parole records.
3. "The parties agree that, to the extent applicable, the defendant may seek, and the Government will not object to, a downward departure from the Stipulated Guidelines Range pursuant to U.S.S.G. § 5K2.23, based on the term of imprisonment for Burrell's attempted murder conviction, on the ground that the offense constitutes relevant conduct to, and is part of, the offense charged in Count 1. The parties agree that the defendant was imprisoned for a total of 5 years, 6 months, and 17 days in connection with the term of imprisonment for his February 11, 2009, shooting." PSR, p. 8.
4. That draft of the PSR was entered as ECF Document # 1936, however it was deleted from the docket since it did not include Mr. Burrell's extensive objections, now included in the Final PSR at pp. 31-35.

Burrell spent incarcerated in state prison from the young age of 16 to the age of 22 is appropriate. This is not an insignificant sentence; it is very close to the 110 month sentence proposed in the PSR. It is also a sentence that "sufficiently addresses the sentencing factors set forth in 18 USC 3553." PSR, p. 37. (*See also*, Mitigation Sentencing Report, whereby Ms. O'Boyle appears to state that the 90 months which Mr. Burrell has already served both in New York State time and in federal detention, is an appropriate sentence.)[5]

### Factors To Be Considered In Imposing A Sentence – The "3553 Factors"

The mandate of 18 U.S.C. §3553(a) is for the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing. Accordingly, pursuant to 18 United States Code § 3553(a) (the "3553 factors") and the holdings in *Booker* and its progeny, we respectfully urge this Honorable Court to consider the 3553 factors, specifically Mr. Burrell's history and characteristics, background and family ties, and his extraordinary rehabilitation prior to and during his current incarceration, in fashioning a sentence that is sufficient but not greater than necessary to comply with the goals of sentencing.

In order to give the Court a comprehensive and unbiased perspective of Nico Burrell's background, history and characteristics we have attached the following as exhibits: **Exhibit A** -- *Mitigation and Sentencing Report by Ms. Kathleen O'Boyle, MSW*, with related appendices; **Exhibit B** – *PSR Comments, Edits, Objections;* **Exhibit C** -- *Certificates of Achievement*; **Exhibit D** – DVD labeled *U.S. v. Nico Burrell, 15 Cr. 95 (AJN), Video Statements by Family and Colleagues* ("Video Statements");[6] **Exhibit E** – Letter to the Court by Mr. Nico Burrell. We believe that the Court, after considering these all important § 3553 factors and the related Mitigation and Sentencing report, will agree that Mr. Burrell should receive a non-Guidelines sentence of 100 months with the credit for his time already served in his prior state prison sentence pursuant to § 5K2.23.

### Mr. Burrell's Family History and Personal Characteristics and his Efforts at Rehabilitation

As documented at length both in the PSR and the Mitigation Sentencing Report filed as part of this sentencing submission, Nico Burrell's short life was a bleak and unstable existence whereby he was raised in households characterized by domestic violence (by both his father and his stepfather towards both his mother and his stepmother), criminality (both parents and stepfather) and dysfunction (deportation of both parents, and then homelessness as a pre-adolescent teen). PSR ¶¶ 53-56, Mitigation and Sentencing Report, pp. 4-7. However, one would never know of his adversities when speaking with Nico. In all of my meetings and conversations with Nico – and there have been many in the past two

---

5.    Mitigation and Sentencing Report, p. 11 § 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense. "Between his New York State sentence, much of which he served while he was still in his teens, and his federal detention at the MCC under conditions harsher than most federal medium security correctional facilities, Mr. Burrell has served a total of 90 months. A sentence of this length satisfies all three of the goals of 18 U.S.C. §3553 (a)(2)(A): it reflects the seriousness of his offenses, promotes respect for the law and provides just punishment for Mr. Burrell's offenses."
6.    In the event that the video cannot be uploaded to ECF, we will be hand-delivering a copy to the Court and the government prior to sentencing.

years – I personally have been impressed with Nico's intellect, his infectiously positive attitude and his resilience and inner strength in the face of difficulties. Upon our very first meeting in April 2016, Nico was calm and confident, demonstrating a level of understanding rare in young men of his age and in his circumstance. He has also demonstrated insight and a fierce determination to succeed at every undertaking. This has been evident, not only in the past two years while he has been incarcerated at MCC and during which time he has embarked on an impressive path in self teachings and learning – he has read an astounding 112 books -- a remarkable feat standing alone, and enrolled in many courses and received certificates of completion, including the very prestigious and highly sought-after Focus Forward Project, where he was one of two Commencement Speakers at his Commencement Ceremony, and which I personally attended -- but also immediately after his release on parole in 2014 and up until his arrest and conviction on the instant matter. Between the ages of 16 and 22, when most young men are in high school and thinking about college, Nico was serving a seven year sentence. In 2014, on parole, experiencing freedom for the first time in more than 5 years, Nico was determined to stay out of trouble. While incarcerated he had discovered a new talent: writing rap lyrics and performing his music. Nico was determined to pursue his new-found passion. He did so tirelessly, obsessively spending his days and nights at a recording studio with producers and other artists, creating his music. In their statements to the Court, both Sherwin Charles, Nico's manager, and Alastair Christopher, one of the directors of Nico's rap videos, attest to Nico's incredible work ethic ("*Nico doesn't stop . . .* " "*Nico would be in the studio from 8pm until 4am;*"), statement by Sherwin Charles; ("*Nico has an amazing work ethic ... he motivates me even though I have been in this business for 18 years ... his energy is magnetic, when you're with him you really feel motivated to work and change your life . . .* "), statement by Alastair Christopher. *See* Video Statements. Nico was on parole during this time, yet with the exception of a few times when he stayed with friends or other family or working in the studio overnight, he was fully compliant with the conditions of his parole, which included a nightly 9 pm curfew. *See* Mitigation and Sentencing Report, p. 6 ("*Apart from a few incidents, mostly due to Mr. Burrell's unstable living situation, he complied with the conditions of his parole for the entire two-year period of supervision. His parole officer's notes indicate a level of trust and a supervision style usually employed with low-risk parolees.*").

## Mr. Burrell's Path Toward Rehabilitation

Mr. Burrell has served a substantial amount of time in prison, both prior to and including his arrest and incarceration on this case. However, he has used his time wisely and is well on the path to rehabilitation. By the time of his sentencing on April 3, 2018, Mr. Burrell will have served a total of 90 months for this offense. *See* Mitigation Sentencing Report, p. 4. This is quite a significant period of time. These past 2 years have proven to be an extreme punishment for him. He has been separated once again from his family and from his sisters and his dear friends, all of whom, as attested in their letters and video recorded statements to the Court, have remained unwavering in their love and support. S*ee* Video Statements, with statements from stepmother Maxine, aunt Keyla, sister Demetria, Grandmother Mabel McLean, Manager Sherwin Charles, and Producer Alastair Christopher. This is especially so of his beloved grandmother, who has been critically ill (*see* Mitigation and Sentencing Report, p. 7, discussing

grandmother's ailing health) *and see* Video Statements, statements by Grandmother Mabel, and aunt and sisters (discussing grandmother's quickly deteriorating health, how she and Nico cherish one another and their belief that due to her chronically ailing health she may not live long enough to see Nico again). However, Nico has taken his dire circumstances and turned them into an opportunity for progress and intellectual growth. During this period, he has kept himself remarkably busy pursuing a path of self-education and learning. He is a voracious reader (he has read more than 112 books), he has become a master chess player (he recently informed me that he beat the (now former) "MCC Chess Master" in 10 games in a row), challenging other inmates in games which he plays *daily* at 6 a.m. He also has enrolled in numerous courses at MCC, for which he has received Certificates of Achievement, such as for the Drug Abuse Education Course, completed in April 2017, and an eight week course entitled "From the Inside Out; Taking personal Responsibility for the Relationships in Your Life," completed in October, 2017. He also recently successfully completed the prestigious and in demand Focus Forward Project and was one of the speakers at his Graduation Ceremony, which I was fortunate to be allowed to attend at MCC several weeks ago. When asked by his instructors how he was faring in the course, the instructors responded in an email:

> Nico is excellent – he is very driven and smart. He is a leader in the course, folks look to him for his thoughts/opinions. He is one of the two selected to be the speech givers at graduation. He is very well spoken, always speaks his mind, and adds many thoughtful perspectives. He has read something like 96 books – Zoe I think wrote down the exact number he gave last class. Nico always does his assignments and is eager to make sure he knows what is required of him. He read the book in the first week and I think had also read it previously.

The instructors have also noted Nico's impressive drive, remarkable intelligence and leadership capabilities. They remarked on his determination to continue to use this experience for further progress. On his Certificate of Achievement the instructors added the following as part of their note to Nico:

> Nico, you've impressed us from the very beginning! . . . [Y]ou shared that you had waited nearly two years to enroll in the Focus Forward Program and that you had just finished reading your 77th book while at MCC. From this introduction, we learned just how persistent and resilient you are in addition to how strong your desire to learn is. You have a strong presence and it was clear that the class, from the start, looked to you as a leader. During discussions about *A Long Way Gone*, it was clear you had really engaged with the book and had drawn intelligent and insightful connections between the book and the real world. You are a beautiful public speaker, too. It is clear you have a real talent for speaking in front of others . . . In your speech you thoughtfully explained how jail has impacted you and how you will make the most from the situation.

*See* Certificate of Achievement from the Focus Forward Project for distinguished achievement, with comments from Instructors Zoe and Nora, attached as part of **Exhibit C**.

Mr. Burrell's intellect, drive and ability to persevere has provided him with the necessary tools for his continued progress in society. He has not squandered his time while incarcerated. He has used it prudently, for introspection and inner development, finding in this dismal circumstance a critical lesson

in life. He understands – and understood when sentenced in 2009 and served five and one half years' incarceration -- that he made a grave mistake. He has made clear to everyone in his life that he is accountable and accepts responsibility for his conduct – a vital step demonstrating rehabilitation.

## Offense Conduct

Mr. Burrell is accused of being one of the leaders within this conspiracy and participating in narcotics trafficking. While Mr. Burrell has accepted responsibility for his participation in this offense, we submit that his participation is not as extensive as depicted in the PSR. Indeed, as the Mitigation and Sentencing Report correctly points out, the most serious offense for which Mr. Burrell has been convicted is the 2009 shooting of a young man identified by the government as a rival gang member, for which he was charged and convicted of attempted murder, and for which he completed a five and one half year sentence. The PSR depicts Mr. Burrell as a powerful and violent leader within the BMB gang. However, as explained in the Mitigation and Sentencing Report "Mr. Burrell's compliance with the conditions of his parole, particularly his nightly curfew, the time and effort he devoted to developing his music career, and the fact that by all accounts Mr. Burrell depended on family members for shelter, food and any money he needed for career related expenses, are incongruent with the lifestyle of a drug dealing gang member. *Id.*, p. 6. (*See also* Video Statements, whereby stepmother Maxine Tomlinson, aunt Keyla, and sister Demetria John discuss the hardships experienced by Nico and his family being homeless and lending Nico money to pay his recording studio and video expenses).

As support for its proposition the PSR relies almost entirely on YouTube videos in which Mr. Burrell appears. ("Burrell's membership and leadership status in BMB was corroborated by one of his Twitter pages . . . "and 'also corroborated by various videos . . .") PSR ¶ 26. With respect to the Twitter accounts, and as we explained in our Objections to Probation attached as **Exhibit B,** Mr. Burrell denies opening these accounts and does not have knowledge of how or by whom the account referenced in the PSR was opened. *See also* PSR, Objections by the Defendant, p. 33. Regarding the videos referenced in the PSR, as we stated in our Objections, these were staged, scripted and choreographed videos, produced by artistic producers, and they do not depict any real events. The videos are nothing more than theatre. The videos were theatrically staged with and for Nico by professional producer/videographers in order to depict real conspiratorial narcotics conduct. All of the items discussed in the PSR, money, cooking "crack" on a stove, baking powder, a black handgun, PSR ¶ 28, were fake props used to depict the plot for the videos and not real events. Accordingly, these videos should not be used to support the contention that Mr. Burrell actually engaged in the conduct depicted and being rapped about in the videos. As part of our sentencing submission and pursuant to 18 United States Code § 3661, we have included a DVD with video recorded statements from family and colleagues of Nico for the Court. One of the video statements is by Mr. Alastair Christopher,[7] a film and photography producer who discusses, among other

---

7.   Alastair Christopher is an award winning film and photography producer with over 16 credits for films that have also received awards and acclaim, including "The Lost Son of Havana;" and "The Streak and Through the Fire (about basketball phenom Sebastian Telfair's last year of high school), both of which aired on ESPN. *See* IMDb Biography of Alastair Christopher, available at http://www.imdb.com/name/nm1589655/bio?ref_=nm_ov_bio_sm.

things, his work with Nico in producing these videos. In his statement to the Court, Mr. Christopher explains that in the videos he produced with Nico, and specifically in the "Aryan Nation" video which Mr. Christopher directed, all of the items depicted were fake props, including the "kilo" depicted in one of the scenes, which was actually Asian flour purchased at a deli in Fort Lee, NJ.

With respect to the statements discussed in ¶ 27 of the PSR, we objected to the PSR's interpretation, as it exaggerates Mr. Burrell's comments. First, Mr. Burrell is only intercepted on two calls, one to co-defendant Mark Williams, and the other referenced in this paragraph (# 27), where the unknown male is discussing Mr. Burrell's sister, Michelle Jemison, driving by the male's home. As we stated in our Objections, this paragraph exaggerates the meaning of Mr. Burrell's words that he is a "gangsta" and referencing "problems." In making these statements, Mr. Burrell was merely engaging in macho braggadocio and empty boasting in an attempt to protect his sister who had recently moved to the unknown male's neighborhood. Since his release from prison, Mr. Burrell had to walk the fine line between the world in which his reputation preceded him and his new creative world of music and artistry. As Ms. O'Boyle points out in her report, most of the youth in his neighborhood "knew Mr. Burrell through reputation and street rumors[,]" and "Mr. Burrell was reluctant to dissuade young gang members from their perception of him, however inflated or exaggerated as it was, as he felt that his status provided him and his sisters with a level of protection." *Id.*, p. 6. Thus, apart from his empty boasting, there is no evidence that Mr. Burrell ever directed, ordered, or engaged in any violence towards the other individual recorded on this call.

In terms of the narcotics attributed to Mr. Burrell, although we stipulated in the plea agreement that the amount involved in this matter was 8,000 pills of oxycodone, PSR ¶ 36, the aggregate amount of Nico's sales is far below this amount. The stipulated quantity merely represents an estimate of narcotics distributed by the conspiracy as a whole which, for purposes of the plea agreement, is deemed reasonably foreseeably to Nico.

Finally, as to the assault on the cooperating witness at MCC mentioned in the PSR at ¶ 29, and also as stated in our Objections, although this conduct is stipulated by the parties in the plea agreement, we would inform the Court that Mr. Burrell did not know the individual in question, that it was this individual who first attacked Mr. Burrell by striking Mr. Burrell in the back of the head while Mr. Burrell was making a phone call at MCC, and that Mr. Burrell was not aware that the individual was a cooperating witness on another matter. *See* also copy of Incident Report, attached to our Objections in **Exhibit B**. We wish to emphasize that we present this information in order for the Court to be able to make a complete assessment under the 3553 factors, so that the Court can make an informed decision in fashioning Mr. Burrell's sentence, as required under 18 U.S.C. § 3553(a).

### Impact of Negative Influences on Mr. Burrell's Life and Correlation with Offense Conduct

Clearly Mr. Burrell's extreme difficulties growing up, the incarceration of both biological parents and his stepfather, their subsequent deportation and the instability in his life from then on, including extreme poverty and homelessness, have impacted his life, leading to his previous and sole conviction

for a shooting in 2009. At the time of that offense, Mr. Burrell was 16 years old. We recognize the seriousness of this offense. However, one cannot ignore the circumstances in his life which undoubtedly factored into his offense conduct. This shooting took place when Mr. Burrell was barely a 16 years young boy, suffering from the traumatic experiences in his life. As Ms. O'Boyle points out in her report, Nico was in an "emotional tailspin after losing both parents and a stepparent to prison and deportation, losing his home as well as his belongings and clothing due to his family's homelessness, and while he was suffering humiliation and bullying from classmates and neighborhood youth." Mitigation Sentencing Report, "Seriousness of the Offense," p. 7.

### The PSR Overrepresents Mr. Burrell's Criminal History Category

The criminal history axis of the Sentencing Guidelines' sentencing table is designed to provide an indicator of the seriousness of a defendant's criminal history and the likelihood that he will commit further crimes.[8] The method prescribed in the Guidelines for calculating a defendant's criminal history category is fraught with the potential for error, as it ascribes or excludes points for certain convictions.[9] A downward departure in a defendant's criminal history category may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). Downward departures under § 4A1.3 may only be "made on the basis of individualized consideration of the circumstances of a defendant's case, rather than a general 'rule.'" *United States v. Mishoe,* 241 F.3d 214, 218 (2d Cir. 2001). Such individualized factors might include the sentence received, and the amount of prison time previously served compared to the sentencing range in the instant case in the absence of a departure. *Mishoe,* 241 F.3d at 218.

We believe the PSR incorrectly ascribes points to Mr. Burrell's prior conviction and that his criminal history is overrepresented in the PSR. Mr. Burrell was ascribed three points for his 2009 attempted murder conviction. PSR ¶ 47. However, the parties did stipulate in the plea agreement that this conviction was relevant conduct to, and is part of the instant offense.[10] Thus, the three points should not have been included in Mr. Burrell's criminal history computation. A deduction of these three points would place Mr. Burrell in criminal history category II (rather than category III as stated in the PSR) and his sentencing range would be 97 to 121 months (rather than 108 to 135 months as stated in the PSR). *Id,* at p. 36.

### The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

With respect to the need to avoid unwarranted sentence disparities, other co-defendants accused of similar or worse conduct have received comparably similar sentences as the one we request. In some cases, other co-defendants accused of similar or worse conduct have received far more lenient sentences.

---

8. Gordeon Mehler, John Gleeson, & David C. James, *Federal Criminal Practice: A Second Circuit Handbook* § 42-30 Criminal History Departures (2016).
9. *Id.*
10. *Supra* n. 3.

For example, Shaquille Dewar, #21 in the indictment, who committed an attempted murder on behalf of the gang whereby he and another individual drove to the location and he exited the vehicle and shot at the intended victim, received a sentence of 79 months. PSR, p. 10. Upon his arrest he was found in possession of a loaded .380 caliber pistol. *See* ECF Document # 1490, Govt' Sent. Mem., pp. 5-6.

Barffour Abeberse, #8 in the indictment, received a sentence of 102 months and 3 years supervised release, though he is considered to be a much more violent offender in comparison to Mr. Burrell. For example Mr. Abeberse was (1) arrested with a loaded firearm for which he was sentenced at state to probation and which he violated twice; (2) participated in a shooting at a public housing project where he shot the victim in the calf and for which he received a two year sentence, was paroled and then violated his parole and was resentenced to jail; (3) participated in the beating and robbery of a woman for which he served less than two years jail concurrently with one of the previous sentences; (4) participated in a brawl that led to the murder of an innocent 15 year old; and (5) sold crack and was found inside of an apartment where a search warrant was conducted and crack and a .45 caliber pistol were recovered. *See* ECF Document # 1621, Gov't Sent. Mem. pp. 7-8.

Mashud Yoda, #9, also considered by the government a leader in this conspiracy, received a sentence of 138 months, adjusted to 96 months' imprisonment upon a §5K2.23 reduction for time served on a prior term of imprisonment that was regarded as relevant conduct. PSR, p. 9. He was a fugitive in this case, and arrested after a manhunt that used significant government resources and several months after the government unsealed its indictment on this case. He was found hiding in Ithaca, New York in a home where drugs and drug paraphernalia were observed in plain view and where small children lived. Among the conduct for which he was accused, including his leadership role, he was arrested at a drug spot following the execution of a search warrant in which law enforcement recovered a loaded firearm, loose rounds of ammunition, and narcotics and drug paraphernalia. The firearm recovered was a ballistic match to the firearm used in the murder of Keshon Potterfield one month earlier. *See* ECF Document # 1985, Gov't Sent. Mem., p. 9.

Anderson Ross, #10, participated in two violent attempted murders, including the beating of a victim whereby the victim was surrounded by Ross and others who were punching, kicking, and stabbing him with a knife. The victim was taken to a hospital and survived, but suffered a puncture to his right forearm, lower back, and kidney, which had to be removed. During this attack, Ross beat the victim while he was being stabbed. Ross received a sentence of 123 months after receiving a §5K2.23 reduction for 42 months served on relevant conduct. *See* ECF Document # 1330, Gov't Sent. Mem. p. 8.

Jafar Borden, #23, received a sentence of 108 months which the Court adjusted, pursuant to §5G1.3(b), for the 45 months he had already served on relevant conduct. He was alleged to have participated in acts of violence including robberies and a shooting. *See* ECF Document # 1334, Gov't Sent. Letter, p. 1.

We respectfully submit that the sentence requested for Mr. Burrell, 100 months with §5K2.23 credit for relevant conduct, is comparable to that of these defendants, responsible in some cases for much more egregious and violent conduct and who have not achieved the strides in rehabilitation that Mr.

Burrell has demonstrated. A sentence any more severe than what is requested herein would be unfair and would create an unwarranted sentencing disparity.

### Application of the § 3553 Factors to Mr. Burrell's Case

Mr. Burrell's uniquely troubled history and background are highlighted in order to move this court to fashion a sentence that is fair and just while allowing for Mr. Burrell to continue on his path of rehabilitation, an important sentencing goal. In Mr. Burrell's case, it is "the nature and circumstances of the offense" as well as "the history and characteristics of the defendant" that justify a lesser sentence. 18 U.S.C. §3553(a)(1). Mr. Burrell's troubled upbringing beginning in adolescence no doubt has factored into his present criminal conduct and led to his previous and current incarceration. Under § 3553 Mr. Burrell's history and characteristics must be taken into account by the Court in fashioning a sentence that factors in the extreme complications in Mr. Burrell's life. Of course, as discussed extensively here and in the Mitigation and Sentencing Report, of the goals set out in 18 U.S.C. § 3553(a)(2), the Government and the Court also must carefully consider the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" 18 U.S.C. § 3553(a)(2). We submit that a sentence of 100 months with 66 months credit for his time served in state prison for the underlying offense serves these interests and goals. As Ms. O'Boyle states in her report, any longer sentence for Nico, a young man traumatized and gravely impacted by the negative influences in his family life and who has already served a substantial sentence for his crime would be excessive:

> Mr. Burrell has spent a total of 90 months (66 months in New York State Department of Corrections prisons and 24 months in MCC detention) behind bars, the past two years in harsh conditions of high security detention at the MCC. Based on his limited involvement in the conspiracy following his release from prison in 2014, his impressive rehabilitation efforts, and what may be a once in a lifetime chance of turning his passion for music into a lucrative career, further incarceration may not only be unnecessary to accomplish sentencing goals, but may actually impede Mr. Burrell's continued rehabilitation and diminish his future prospects for leading a successful, law-abiding life.

Mitigation Sentencing Report, p. 4.

> In her assessment of the progress Nico has made in his rehabilitation, Ms. O'Boyle notes:
> Mr. Burrell has been profoundly affected by his most recent arrest, as evidenced by his single-minded determination to improve his circumstances and prepare himself for life after prison. He has already accomplished considerable rehabilitation and knows that any future criminal behavior would permanently destroy his budding music career . . . Mr. Burrell's prospects, his self-rehabilitative efforts and his strong support network in the community greatly increase his chances of living a law-abiding, crime free life. He has fared well in the past under community supervision and at this point in his life he has even more incentive to comply with his community supervision and continue his rehabilitation.

*Id.*, at 12.

Nico accepts full responsibility for his conduct and understands that punishment is in order, and that in addition to any additional period of incarceration to the time he has already served (the 66 months served previously and the 24 months served in federal detention to date), that he is facing a term of supervised release of up to three years. PSR, p. 36. This sentence combination is significant and more than adequately reflects the seriousness of the offense. At Mr. Burrell's age this sentence will undoubtedly serve as a deterrent to any future criminal conduct by him. *See* letter by Nico Burrell attached as **Exhibit E** describing how he is motivated to pursue his love of music and determined to continue on his path of rehabilitation. ("*There are two things that will motivate me to never return to jail and that will push me to bettering myself more, and that is the determination in proving everybody wrong about me and the fear of feeling I am a let-down and a disappointment to my family.*"). Nico is a highly intelligent and motivated individual. He obtained his GED while serving his state prison sentence (and took the courses again while incarcerated at MCC), has taken the initiative to enroll in other courses and has excelled at the, all while also embarking on a program of self-education and continued learning. But he also desires to someday go to college and continue his intellectual growth. However, his greatest dream is to continue on his artistic path in the music industry. He should receive a sentence that will allow him the opportunity to continue in his intellectual and artistic endeavors, a feat either too grand or too onerous for the Bureau of Prisons, which offers few -- if any -- college programs to inmates.[11] It is now understood that "the most effective way to keep people out of prison once they leave is to give them job skills that make them marketable employees. That, in turn, means restarting prison education programs that were shuttered beginning in the 1990s, when federal and state legislators cut funding to show how tough they were on crime."[12] Mr. Burrell is intellectually hungry; he would very much like to go to college, to continue with his intellectual endeavors with the hope of finally improving his marketability within society and in his life. He should receive a sentence that will allow him to continue in his intellectual, artistic and musical pursuits. There would be no greater tragedy than to keep a young man of his intellectual capacity and artistic talents incarcerated any longer.

## Conclusion

Even when the Sentencing Guidelines were mandatory, sentencing courts were to treat those before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform

---

11.     It is no secret that the Bureau of Prisons is lacking in its educational offerings for inmates. While it does offer simple literacy programs, such as general GED classes and certain simple vocational training – the BOP does not offer college degrees.  *See,* https://www.bop.gov/inmates/custody_and_care/docs/BOPNationalProgramCatalog.pdf.  *And, see,* https://www.bop.gov/inmates/custody_and_care/education.jsp ("All institutions offer literacy classes, English as a Second Language, parenting classes, wellness education, adult continuing education, library services, and instruction in leisure-time activities."), *id. See also* Mitigation Sentencing Report, p. 13, n. 13: "The obstacle that currently exists in the BOP education strategy is that the existing Education Branch does not have the expertise, authority, nor responsibility to develop, articulate, and implement a common agency-wide vision, and to develop effective strategies and policies for achieving that vision. Moreover, the Education Branch does not have a sufficient organizational capacity, adequate budget resources, nor an adequate system of program management and accountability to implement it." (Citation omitted).

12.     The Editorial Board, *A College Education for Prisoners,* N.Y. TIMES, Opinion, February 16, 2016. Available at https://www.nytimes.com/2016/02/16/opinion/a-college-education-for-prisoners.html. *See also* Mitigation Sentencing Report, p. 13, n. 13. "[E]ducation and occupational training today in the federal prison system is simply not able to have as much an impact on reducing recidivism as it otherwise could."

and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). The decision in *Booker* and the command of the statute to impose a sentence that is "sufficient, but not greater than necessary," has given sentencing courts greater latitude to impose a sentence that fits the crime and the person before the court. Mr. Burrell's troubled background as well as his efforts at rehabilitation warrant a sentence tailored to his individual circumstances. Thus, we respectfully ask this Court to exercise its discretion and to sentence Mr. Burrell to a lenient sentence reflective of his difficult background, history and circumstances, to a period of incarceration of 100 months with credit for the 66 months he has already served in state prison for the underlying offense.

      WHEREFORE, it is respectfully requested that the Court take note of all of the information provided herein, and sentence defendant accordingly.

                              RESPECTFULLY SUBMITTED

                              *s/ Judith Vargas*

                              Judith Vargas, Esq.
                              *The Law Offices of Judith Vargas*
                              *20 Vesey Street, Suite 400*
                              *New York, NY 10007*
                              *Tel: (212) 668-0024*
                              *Fax: (212) 668-0060*
                              Email:   judithvargas1@aol.com

cc:    AUSA Rachel Maimin
        Mr. Nico Burrell