**Kathleen O'Boyle, MSW**
**Sentencing and Mitigation Specialist**
1125 Lorimer Street, 4C
Brooklyn, New York 11222

718.389.7654 (o)
917.685.3062 (c)
kathleenoboyle622@gmail.com

March 23, 2018

Honorable Alison J. Nathan
U.S. District Court Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re: Nico Burrell
    Docket No.: 15 CR 95-02 (AJN)

Dear Judge Nathan:

      This sentencing mitigation report is submitted on behalf of Nico Burrell at the request of his attorneys, Judith Vargas, Esq. and George R. Goltzer, Esq. and by Court appointment. Mr. Burrell pled guilty to Racketeering Conspiracy on August 16, 2017, before Honorable Katherine H. Parker, and he is scheduled to be sentenced by Your Honor on April 3, 2018.

      By way of background, the writer is a former U.S. Probation and Pretrial Services Officer in both the Southern and Eastern Districts of New York with over 35 years of criminal justice and substance abuse treatment experience in the public, non-profit and more recently the public sector providing training, technical assistance and direct services to criminal justice professionals, defense attorneys, defendants, inmates, and court systems throughout the country.

      This report was developed based on information obtained from a review of the legal documents in this case, including the indictment, the plea agreement and the Presentence Investigation report (PSR). Additionally, the author has conducted numerous in person and telephone interviews with members of Mr. Burrell's family, including his stepmother, his siblings, his aunt and grandmother who raised him, his business manager and telephone contact with Mr. Burrell's mother, who lives in Jamaica, West Indies.

      Information provided by Mr. Burrell was corroborated by individual family members in separate interviews and supported by records relating to Mr. Burrell's background including, but

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 2

not limited to records from the New York City Administration for Children's Service (ACS); NYPD and Bronx District Attorney's Office records relating to Mr. Burrell's 2009 arrest and conviction; his New York City and State and Bureau of Prisons (BOP) detention and incarceration records; and Mr. Burrell's New York State Division of Parole records, including a chronology of his two year period of supervision dating from his release in June 2014 up until his arrest on the instant offense on April 27, 2016.

In order not to belabor the Court, this letter will not address the specifics of the broad investigation of this case and of the conspiracy, with which Your Honor, by this time, is no doubt uniquely familiar. In the same vein, the details of Mr. Burrell's background as described in the PSR are mostly accurate, and specific issues regarding the instant offense which are in dispute are argued in the objections to the draft PSR, listed in the revised PSR, and some may be raised at the sentencing for Your Honor to rule on. Accordingly, this letter will not address these issues, except as they may pertain to the mitigating factors in this case.

**Introduction**

Nico Burrell, a 25-year-old Bronx native, did not have an easy time growing up. Both of his parents were deported to Jamaica before he was 16 years old and he and his three sisters were left in the care of their 19-year-old aunt and their grandmother, who suffered from health problems. He and his sisters spent their childhood and teenage years moving back and forth from Bronx apartments to homeless shelters, as his aunt and grandmother struggled to support the family and pay the rent. Mr. Burrell was living in a shelter in 2009 when he was arrested for shooting another teenager who had been threatening him. Though luckily neither his target nor the innocent bystander was seriously injured, Mr. Burrell was sentenced to six and a half years in prison.[1] Mr. Burrell spent the remainder of his teenage years in Riker's Island and at a number of New York State Department of Corrections' prison facilities. Upon his release, he embarked on what he hoped would be a career in music and his live performances. His YouTube videos

---

[1] The PSR, p. 23, ¶ 47, indicates that the Government's information stated that Mr. Burrell's target suffered a bullet wound to the chest, which is inaccurate. Notes written for the Bronx ADA who would be covering the case for the assigned ADA indicate that the judge was considering a 5-year sentence and that he specifically asked to be provided information regarding the victims' injuries. We do not know what description the judge may have been given. The ADA's notes to the ADA covering the case give an accurate description (target shot in lower back and innocent bystander through arm) of the injuries, but do not include information in the Bronx DA's case description indicating that both victims were treated at a local hospital and released. Treated and released is standard medical terminology indicating that a patient is treated in the emergency room and released without being admitted to the hospital. The judge sentenced Mr. Burrell to 78 months, six months below the seven-year sentence recommended by the assigned ADA, but 18 months more than the judge had originally considered. (See appendix A.)

eventually attracted the attention of a talent promoter/manager and others in the rap music industry, both prior to and following his arrest on the instant offense. Mr. Burrell's manager has assisted in maintaining a high level of interest in Mr. Burrell's music until he is released.

Mr. Burrell has admitted his involvement in the gang related conspiracy that resulted in his arrest along with over 125 codefendants, in what was hailed at the time as the biggest gang bust in New York City history. This conspiracy, like dozens of others before the courts in this district, contributed to the culture of crime, drugs and gang violence destroying neighborhoods and lives in already vulnerable communities. It does appear though, given Mr. Burrell's plea agreement, the sentencing recommendation in the PSR, and the verified fact that Mr. Burrell was nearly destitute and homeless for two years prior to his arrest, that Mr. Burrell played a lesser role than originally alleged. Mr. Burrell's substantive offenses underlying his involvement in the conspiracy are a 2009 conviction for Attempted Murder, for which he was sentenced to six and a half years in Bronx Supreme Court, and the sale of Percosets, prescription narcotic painkillers on a few occasions during the two-year period prior to his arrest.

Mr. Burrell has made good use of his 24 months in detention at the MCC. His GED was recognized[2] and he was one of two commencement speakers at a graduation ceremony at the MCC for inmates who had completed the Focus Forward Project. He has also participated in and completed every other self-improvement program available to him at the MCC, including anger management, drug education and the BOP's non-residential drug treatment program (even though he has never used drugs and rarely drinks). More importantly, he has in the past two years engaged in a voluntary self-education program by spending most of his free time reading and learning about a wide array of subjects, including vocabulary building, fundamentals of investing, history, politics, current events, and most recently, meditation. In a detention facility whose priority is security management, not rehabilitation, he has beat the odds. His penchant for learning and self-reflection, his talent and aspirations for his musical career, and the love and support of his family, have helped him reset the trajectory of his life from an emotionally troubled, gang-involved teenager to a young man with a promising future.

The Probation Office has determined that Mr. Burrell's guideline range is between 108 and 135 months and between one and three years of supervised release. They further recommend, and the government has stipulated that it will not object, to Mr. Burrell being credited with the 66 months he spent imprisoned for his New York State attempted murder conviction, which is conduct related to the instant conspiracy. Mr. Burrell has spent a total of 90 months (66 months in New York State Department of Corrections prisons and 24 months in MCC detention) behind bars,

---

[2] Mr. Burrell earned his GED while in Greene Correctional Facility, but for some reason he was not listed on the New York State Board of Regents list. The mistake was recently rectified when Mr. Burrell's stepmother presented the original diploma and the MCC publicly recognized Mr. Burrell's achievement.

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 4

the past two years in harsh conditions of high security detention at the MCC. Based on his limited involvement in the conspiracy following his release from prison in 2014, his impressive rehabilitation efforts, and what may be a once in a lifetime chance of turning his passion for music into a lucrative career, further incarceration may not only be unnecessary to accomplish sentencing goals, but may actually impede Mr. Burrell's continued rehabilitation and diminish his future prospects for leading a successful, law-abiding life.

### **Nico Burrell's Personal and Family Background[3]**

Nico Burrell, the younger of two children of Michelle Jemison and Andy Burrell, was born in and raised in the Bronx. His parents separated when Mr. Burrell was an infant and they had sporadic contact until the senior Mr. Burrell was incarcerated on drug charges and deported to Jamaica. From the age of five until he was 13 years old, Mr. Burrell lived with his mother, his stepfather, an older sister, a younger sister, and a younger half-sister.[4]

Duane John, Mr. Burrell's stepfather, was a member of Mr. Burrell's household for much of Mr. Burrell's childhood. According to Mr. Burrell and as corroborated by his family members, for a time, Mr. John owned a recording studio in Manhattan and his income may or may not have been supplemented by illegal activities for which he was later convicted. Mr. Burrell's mother owned a beauty parlor in the Bronx. Their combined income allowed the family to move to Fort Lee, New Jersey. Though their new home was a considerable upgrade in their living circumstances, Mr. Burrell and his sister continued to witness their mother's physical abuse at the hands of Mr. John. According to Mr. Burrell's stepmother, Maxine Thomlinson, Mr. Burrell also witnessed his stepfather physically abuse her and his mother, as his parents had intermittent contact while Mr. Burrell was growing up and while his stepfather was living with Ms. Thomlinson. Mr. Burrell's father was deported to Jamaica for the second time in 2005 after serving three years for illegal reentry. His stepfather was arrested on federal drug conspiracy and gun charges in 2007 and is currently serving a 20-year sentence after which he will be deported to Jamaica.

---

[3] Once again, efforts have been made not to duplicate specific details of Mr. Burrell's personal and family background that were made available to the Court in the PSR. Rather, this section is a summary of already available background information with a focus on information not contained in the PSR. Similarly, we are not attaching voluminous documentation obtained during the mitigation investigation documenting facts pertaining to Mr. Burrell's background already verified by the Probation Office.

[4] In addition to Anita, 26, Michele, 22 (codefendant), and half-sister, Demetria John, 19, Mr. Burrell has two half-siblings, Imani, 21, and Andy, Jr., 19, born to his father and his step-mother, Maxine Thomlinson. He has several step-siblings from his father's and stepfather's other relationships, including Okeifa John, Shaquille John, and Shanice John, all three of whom are codefendants in this case. Only one step-sibling, Shanise John, 24, lived with Mr. Burrell for a time when they were growing up.

Following Mr. John's imprisonment in 2005, Mr. Burrell's mother could no longer afford to manage her business and the family moved in with Mr. Burrell's maternal grandmother, Mabel McLean, who shared an apartment with his maternal aunt, Kaela McLean. With only Mr. Burrell's mother's meager income from a part-time job, the family was having a tough time making ends meet. Three days before Christmas, 2005, Mr. Burrell's mother was arrested for shoplifting Christmas presents at the White Plains mall. She was charged with petit larceny and child endangerment and brought to the local precinct with Mr. Burrell's sister, Michelle. Both were released when Mr. Burrell's grandmother went to the precinct and paid $850 to cover the cost of the merchandise and a fine.

Because Mr. Burrell's mother had involved her minor daughter Michelle in the commission of the theft, the Administration for Children's Services (ACS) commenced an investigation of the family's circumstances. ACS conducted a home visit the following day, December 23, 2005, and found the house clean, sufficient food in the refrigerator and adequate sleeping arrangements. The family's income was determined to be Mr. Burrell's mother's $100 weekly income and $460 in food stamps and $480 in monthly public assistance. ACS also learned that the family owed several months' rent. Three subsequent home visits over a four-month period before the ACS case was closed, determined that the children were all in good physical and mental health.

Mr. Burrell's mother and grandmother scraped by until 2007, when Mr. Burrell's mother was once again arrested. Mr. Burrell is not sure of the reason for her arrest but said it might have been drug related. Family members were equally vague about the details of Ms. Jemison's arrest, except for the fact that she was incarcerated for a brief time and picked up by ICE directly from detention and deported to Jamaica, without the opportunity to see her children and say goodbye. Mr. Burrell, who was 15 years old at the time, never saw his mother again.

Mr. Burrell's mother's deportation left her children traumatized, created an insurmountable financial hardship for his grandmother and took a toll on her health. Mr. Burrell's aunt, Kaela McLean, was granted kinship care of Mr. Burrell and his siblings, but at only 19 years of age, the burden of taking care of three teenage children and her sick mother proved overwhelming. In between evictions from a series of apartments for nonpayment of rent, the family lived in New York City homeless shelters.

In October 2008, Mr. Burrell and his family found themselves in yet another homeless shelter, and Mr. Burrell in a new neighborhood and school. According to Mr. Burrell's aunt and his stepmother, Mr. Burrell's and his siblings had clothing stolen while living in shelters, and as a result often had to wear the same clothing to school several days in a row. Mr. Burrell, who was small for his age, complained to his stepmother of being teased by classmates because he was living in a shelter and physically bullied on his way to and from school. Mr. Burrell recalls that he

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 6

asked his stepmother if she could start driving him to school from then on. One day, Mr. Burrell borrowed a gun and on the way to school he spotted two of the boys who had previously jumped him, and he shot at them. He wounded one and injured an innocent bystander. He was arrested and later convicted for attempted murder and served 66 months of a 78-month sentence before being released to serve five years of parole supervision.[5]

After serving five and a half years in New York State prisons, during which time he earned his GED, Mr. Burrell was released to a New York State Department of Corrections half-way house in March 2014 and then placed on parole and released to his grandmother's apartment on August 28, 2014.

Determined to stay out of trouble and to pursue his new-found passion of writing rap lyrics and performing, Mr. Burrell complied with the conditions of his parole, which included a nightly 9 pm curfew. Apart from a few incidents, mostly due to Mr. Burrell's unstable living situation, he complied with the conditions of his parole for the entire two-year period of supervision. His parole officer's notes indicate a level of trust and a supervision style usually employed with low-risk parolees. Mr. Burrell notified his parole officer of upcoming club performances and provided fliers announcing performances. His parole officer made follow up verifications and approved every curfew waiver for performances that Mr. Burrell requested. An entry in Mr. Burrell's parole chronology shortly before his arrest on the instant offense, indicated that due to his unstable residence and lack of income, he was referred by parole to the Bellevue Men's Shelter. The parole chronology notes also indicate that he had no positive drug test results during his time on parole (from 2014 until his arrest on the instant matter in 2016), and that he had successfully completed all parole mandated programs. (Parole chronology attached as appendix B.)

Mr. Burrell's compliance with the conditions of his parole, particularly his nightly curfew, the time and effort he devoted to developing his music career, and the fact that by all accounts Mr. Burrell depended on family members for shelter, food and any money he needed for career related expenses, are incongruent with the lifestyle of a drug dealing gang member. While it is true, and Mr. Burrell has admitted, that he sold prescription painkillers on several occasions during the time between when he was released on parole in June 2014 until his arrest in April 2016, it seems that Mr. Burrell's biggest concern was staying out of trouble and managing the street credibility that was conveyed upon him by his attempted murder conviction and five and a half year period of imprisonment. This was true particularly with the youth in the younger gang associates who only knew Mr. Burrell through reputation and street rumors. Mr. Burrell was reluctant to dissuade young gang members from their perception of him, however inflated or exaggerated as it was, as he felt that his status provided him and his sisters with a level of protection. Instead, he tried, but

---

[5] Details of Mr. Burrell's 2009 offense are discussed in the introduction section of this letter and in footnote 1 on page 3.

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 7

did not fully succeed, to walk a fine line between the new life and music career he aspired to and living up to the reputation that preceded him when he was released from prison, in order to survive and protect his family in the neighborhood.

As previously stated in this letter, Mr. Burrell has made significant strides in his maturity and his world view during the past two years he has spent in detention. Equally important, he has maintained his close family ties, which will provide him with a dedicated support system when he is released back into the community. Mr. Burrell's grandmother's steadily failing health (she has been hospitalized numerous times since his arrest) has been a source of constant anxiety for him and Mr. Burrell's absence has, in turn, negatively affected his grandmother's health. Mr. Burrell's biggest fear is that his grandmother will die before he can be reunited with her. Mr. Burrell's grandmother and his aunt are willing to let Mr. Burrell live with them for whatever period he needs to reintegrate into the community and live independently. In the meantime, the clock is ticking, as Mr. Burrell's grandmother's health has drastically declined. She has been hospitalized several times in the past two months and is relying on dialysis.[6]

**Sentencing Considerations**

1. **The Seriousness of the Offense**

The most serious offense for which Mr. Burrell has been convicted is the 2009 shooting of a young man identified by the government as a rival gang member. He was charged and convicted of attempted murder, and though thankfully his target's and the innocent bystander's injuries were not life threatening, they easily could have been. This shooting took place when Mr. Burrell was 16 years old and in an emotional tailspin after losing both parents and a stepparent to prison and deportation, losing his home as well as his belongings and clothing due to his family's homelessness, and while he was suffering humiliation and bullying from classmates and neighborhood youth. Based on information provided by the government and contained in the PSR, Mr. Burrell's involvement in the conspiracy and his sale of prescription drugs were limited in comparison to some of the substantive crimes of codefendants in the conspiracy by the fact that Mr. Burrell was incarcerated for nearly six years during the nine-year timespan of the conspiracy and was under close parole supervision and nightly curfew following his release for nearly two years until the time of his arrest on the instant matter. Mr. Burrell admitted and took responsibility for his crimes and at the time of sentencing, he will have served a total of 90 months behind bars (66 months in New York State Department of Corrections prisons for his 2009 conviction, and 24

---

[6] Mr. Burrell's stepmother was provided a NYS HIPAA form (which would allow defense counsel to obtain Mr. Burrell's grandmother's hospital records), and requested that it be signed and notarized, but it has not yet been returned to us.

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 8

months in MCC detention). He has spent the past two years in harsh conditions under high security detention at the MCC. People perceive time in proportion to their own experiences which is why, the older one gets, the faster time seems to pass. For a 25-year-old such as Mr. Burrell, serving more than a quarter of his life in prison is a very long time.

2. **The History and Characteristics of the Defendant**

Despite his background and environment, including five and a half years in New York State prisons, one of which has earned the inglorious nickname of "gladiator school," Mr. Burrell has ended up decidedly better, not worse than when he was arrested at the age of 16. Except for a limited lapse when on a few occasions he sold prescription drugs (supplied at the time by a girlfriend who had a renewable prescription for painkillers due to an injury), Mr. Burrell has worked hard to build a career in music and has spent his time in detention on self-improvement. Shortly before his arrest on the instant offense, Mr. Burrell began workjng with a music manager, Sherwin Charles, who was willing to invest his time without pay to help advance Mr. Burrell's career. Mr. Burrell has always believed that a career in music would be his ticket out of the neighborhood, and with good reason, as careers in rap music have made millionaires out of kids with similar backgrounds, including more serious past criminal records.[7]

Mr. Burrell continues to be cheered on in his pursuits by his close extended family and by friends and neighbors who know Mr. Burrell not as a gangster, but as a loving brother, son, friend and mentor. Attached to this letter are more than a dozen letters which were collected by Mr. Burrell's family members from people in the community. Many of them do not look like the kind of letters that are routinely submitted to Your Honor before sentencing. They are, however, the sincere and unedited thoughts and words of people who have known Mr. Burrell for many years, many of them young people who may be deterred by what they consider the harshness of the sentence that Mr. Burrell has already satisfied, and hopeful, if they perceive that punishment can be fair, but also compassionate and focused on rehabilitation.

Crystal Diamond Smith knew Mr. Burrell from the neighborhood when they were growing up, but the two became close friends several years ago, when they bonded over their interest in music. In her letter to the Court, Ms. Smith writes:

---

[7]. One notable example is the popular artist and media megamogul "JayZ" (self-admitted former drug dealer with prior convictions for weapons and a stabbing), Dillon, Nancy, *Jay Z Asks Judge to Keep Criminal Past, Net Worth Out of Civil Trial Over Song Rights: Report*. DAILY NEWS, Sept. 1, 2015, Available at http://www.nydailynews.com/entertainment/music/jay-z-asks-judge-criminal-civil-trial-article-1.2344577.

    I was at a rocky point in my life when I turned to him for guidance. I wanted to bring forth a song that I had wrote based on a painful experience. I wrote the song and asked if Zii along with a female artist could sing it. I didn't want to sing on it at all. But when I brought it to his attention he told me the only way he'll be a part of it is if I sing. I made the mistake by telling him I used to sing. I still remember his words "the first thing is to never care about what people think, and don't let fear stop me from doing something that I deep down love to do. I didn't know wether [sic] to cry or smile. I agreed and every [sic] that moment I found my voice. (Appendix C.)

Long time neighbor of Mr. Burrell's family, Yashika Goulborne writes of Mr. Burrell's kindness to her handicapped son:

    Whenever someone he knows is in need, he does his best to assist them in anyway. Countless times I couldn't find someone to help me with my disabled step-son and he has come to my rescue. There were times when my son had seizures and he was a phone call away, helping me monitor them and making decisions on whether or not to take him to the ER. He never once left our side. My son has taken such a liking to Nico. My son suffers from bipolar disorder and to take my son out of depression he gets in sometimes, a trip to the ice cream shop with Nico always makes his day. I could never repay him for all he has done for me and my family. (Appendix D.)

Mr. Burrell's friend, Alexis Simmons, expresses a common theme in the letters written to the Court – Mr. Burrell's positive outlook and his desire and ability to make people feel better about themselves and life:

    At 21, I hit rock bottom. Ready to give up. I felt like I had run out of options. Waking up and going to sleep crying. I had got fired from my job, I was 1 step away from being homeless, and meals were harder to come by. Even worse, My family didn't live in New York so I felt more than alone at times…. A couple months down the line I met this guy who noticed me sitting on the curb crying. For about an hour he just allowed me to cry and let everything out. We talked for hours about life, both good and bad. I didn't know this boy from a hole in the wall but you couldn't tell. We went from me talking about giving up to talking about music. He listened to something I had wrote and his reaction was priceless. Especially because he was starting his music career as well. "It's no way you could've possibly thought about giving up with a talent like that! That right there is what's going to get you out of here!"

> It was kind of weird because I was older than him, talking to him for a few hours I felt like I was being encouraged by my older brother. He was smart and so positive. He kept telling me bad days don't last forever, they just come once in a while to make you stronger. From that day on anytime something went wrong I would always smile . I knew what was coming next. Me and that guy never lost contact! We got even closer and now I call him my brother.
>
> His heart is different. It's rare. He wants everyone around him to be just as loving as him. I can honestly say that Nico Burrell plays a big part in more than half of the things I've accomplished in the past few years and I pray that he will be here to continue to do exactly what he has been doing. (Appendix E.)

Walter Cobblah, who met Mr. Burrell through the music business, describes how Mr. Burrell helped him through a difficult time:

> I met the defendant during a difficult time in my life. Just losing my job and a close family member…
>
> …What I say about Nico is true, and therefore I would like to share a personal story; I was recently diagnosed with epilepsy. During my times to recover from three sporadic seizures Nico made sure that my promotional events were still as successful as they would've been if I were there. While I was in the hospital Nico picked up my slack and continued to keep my business and brand growing. If it wasn't for his help in my time of need and recovery I would of no longer have a brand. (Appendix F.)

And finally, Mr. Burrell's mother, who has not seen her son for ten years, writes about an incident that she believes is indicative of her son's true character and begs the Court for leniency:

> I want to share with you about my son Nico. One day a lady/ miss Kissean Breswick wrote me on Facebook thanking me. I know no reason why she should. She went on by saying my son helped her out in a very big way. When I ask what he did she said her 13 year old daughter wasn't listening her being disrespectful cut classes and coming home extremely late. She was talking about it. Nico heard her and ask if he can speak to her daughter/Ms Solange Smith and she said yes. She then gave Nico her address and phone number.  Nico call 2 days after n went to see her she went on by saying she left them in the room together. She dont know what Nico told her daughter but from that day until now her grades went up she's home on time and being respectful. She went on by saying even her teachers notice the changes she said Nico was a angel in

>disguise Your Honor. I say this to show you my son's character and your character is who you are.
>
>I love my son Your Honor with every fiber in my body and am begging that if you see it fit please have some leniency on him and if its Gods will I know you will. As a mother I am asking you for leniency for mercy for my son. I beg of you only if Your Honor give him a chance to spend these last few days with his grandma.
>
>I am thanking you in advance Your Honor for one of my many blessings! God bless you and your family cause a family is everything ! (Appendix G.)[8]

3. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

It should always be the goal of sentencing to prevent unnecessary incarceration and to limit prison sentences to those individuals who pose the greatest risk to society. As renowned criminologist and advocate for criminal justice reform, Norval Morris, argues, when determining punishment, "the least restrictive (punitive) sentence necessary to achieve defined social purposes should be imposed."[9] While incarceration is an appropriate sentence for some offenders and certainly for serious offenses such as the one to which Mr. Burrell has pled guilty, excessively long terms of imprisonment may not always have the intended deterrent effect, but rather, may increase an offender's chances of recidivism. Between his New York State sentence, much of which he served while he was still in his teens, and his federal detention at the MCC under conditions harsher than most federal medium security correctional facilities, Mr. Burrell has served a total of 90 months. A sentence of this length satisfies all three of the goals of 18 U.S.C. §3553 (a)(2)(A): it reflects the seriousness of his offenses, promotes respect for the law and provides just punishment for Mr. Burrell's offenses.

4. **Deterrence**

There is little reason to believe that continued incarceration would increase the general deterrence already achieved by the arrests, convictions and sentences in this case. The Sentencing Commission has weighed in on the issue of general deterrence and street drug crimes and concluded that long prison sentences do little to achieve general deterrence due to the fact that there is a nearly

---

[8] Additional letters written to the Court on Mr. Burrell's behalf and not quoted in this letter, are attached in bulk as appendix H, including a letter from his Grandmother, Ms. Mabel McLean and his girlfriend, Ms. Dinah Leybot.

[9] Morris, Norval (1974). *The Future of Imprisonment*. Chicago: University of Chicago Press, p. 59.

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 12

endless supply of young men in communities such as the South Bronx ready to step up and fill the places of those who are incarcerated.[10] Rather, research shows that it is the certainty of punishment, not the length of the sentence that provides general deterrence, as most potential drug offenders are not knowledgeable about sentencing policy and the length of prison terms imposed for such crimes and they do not believe that they will be caught. [11]

As for personal deterrence, Mr. Burrell has been profoundly affected by his most recent arrest, as evidenced by his single-minded determination to improve his circumstances and prepare himself for life after prison. He has already accomplished considerable rehabilitation and knows that any future criminal behavior would permanently destroy his budding music career. By the same token, continued incarceration will almost certainly outlive the recent attention he has received from his YouTube videos, thereby destroying his career prospects as well as his dreams and aspirations; strong motivators for success.

5. **To Protect the Public from Further Crimes**

Mr. Burrell's prospects, his self-rehabilitative efforts and his strong support network in the community greatly increase his chances of living a law-abiding, crime free life. He has fared well in the past under community supervision and at this point in his life he has even more incentive to comply with his community supervision and continue his rehabilitation. Also tipping the scales in favor of Mr. Burrell's low risk of reoffending is the fact that he has never used any kind of drugs and rarely drinks, eliminating the drug induced bad judgement that often accompanies drug use relapse.

6. **To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Mr. Burrell knows that he will have to find employment so that he can support himself while he is pursuing his musical career. He has several skills that should make his job search successful. He earned a certificate in building maintenance while in prison, an OSHA certificate

---

[10] United States Sentencing Commission, (2004). *Fifteen years of guidelines sentencing: An assessment of how well the federal criminal justice system is achieving the goals of sentencing reform*. Available at http://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/fifteen-years-guidelies-sentencing.

[11] *See* Williams, Kurt., Gibbs, John P. and Erickson, Maynard L., *Public knowledge of statutory penalties: The Extent and Basis of Accurate Perception,* Pacific Sociological Review, 23(1), 1980. *See also,* Tonry, Michael, *Learning from the Limitations of Deterrence Research in Crime and Justice: A Review of Research*, edited by Michael Tonry. The University of Chicago Press, 2008.

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 13

while on parole and has kitchen experience from his assignment at the MCC. Under community supervision, Mr. Burrell will get referrals and any other needs identified by his supervising probation officer will be addressed.

**Conclusion**

Nico Burrell has accepted responsibility for his involvement in a serious racketeering conspiracy. He knows and regrets that he contributed to the culture of drugs and violence in his community and has spent the past several years actively increasing his chances for a successful, law-abiding life in the community. Events in Mr. Burrell's background, particularly his difficult formative years, his mother's deportation, and a transient life in New York City shelters in neighborhoods beset by drug dealing and gangs, mitigate, but do not excuse Mr. Burrell's criminal actions. They do, the writer believes, provide a picture of the world in which Mr. Burrell came of age and the realities that influenced his teenage world view and his prospects for the future. It is a world that many who have had the luxury of a stable home and community and ample opportunities to get a good education and find decent employment can hardly imagine. As put so succinctly by Philip J. Cook and Jens Ludwig in their article, *The Economist's Guide to Crime Busting*, "Most of us choose to abstain from crime in part because we have a lot to lose if we get caught. The calculus for an unemployed dropout with readily available criminal options and few licit prospects is likely to be quite different."[12]

Mr. Burrell has benefited from his time in prison and in detention, but has also exhausted the BOP's rehabilitative resources.[13] Continued incarceration would increase the punitive effects of his sentence, but would risk stagnating Mr. Burrell's rehabilitative achievements and depriving him of a once in a lifetime opportunity to break into the music business while he is still attracting the attention of audiences and people who are in the position to promote him. Mr. Burrell was only 16

---

[12] Ludwig, P. and Ludwig, J., *The Economist's Guide to Crime Busting*, Wilson Q, Winter (2011) at 62.

[13] A 2016 Bureau of Justice assessment of the Bureau of Prisons' education and vocational programs described the current status quo of its program: "The obstacle that currently exists in the BOP education strategy is that the existing Education Branch does not have the expertise, authority, nor responsibility to develop, articulate, and implement a common agency-wide vision, and to develop effective strategies and policies for achieving that vision. Moreover, the Education Branch does not have a sufficient organizational capacity, adequate budget resources, nor an adequate system of program management and accountability to implement it. As a result, education and occupational training today in the federal prison system is simply not able to have as much an impact on reducing recidivism as it otherwise could." *Federal Bureau of Prisons Education Program Assessment Final Report*, conducted by Bronner Group, LLC , United States Department of Justice (2016, Chicago, IL.) Available at
https://www.justice.gov/archives/dag/page/file/914026/download

Hon. Allison J. Nathan
March 23, 2018
Re: Nico Burrell; Docket No.: 15 CR 95-02
Page 14

years old when the conspiracy he was involved in began. He has been incarcerated for seven and a half of the past nine years. He has matured, but he is still young enough to start afresh and put his past behind him. A sentence that would allow him to begin his new life soon would achieve all of the goals of sentencing and be in the best interest not only of Mr. Burrell, but of the community to which he would eventually be released, regardless of the length of his sentence.

Respectfully submitted,

*Kathleen O'Boyle, MSW*

Kathleen O'Boyle, MSW

cc: Judith Vargas, Esq., Defense Counsel
    George R. Goltzer, Esq., Defense Counsel
    Rachel Maimin, A.U.S.A.