I43QBURs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

            v.                          15 CR 95 (AJN)
                                        Sentence
NICO BURRELL

                 Defendant
------------------------------x

                                        New York, N.Y.
                                        April 3, 2018
                                        3:00 p.m.


Before:

                    HON. ALISON J. NATHAN
                                        District Judge


                      APPEARANCES

GEOFFREY S. BERMAN
      Interim United States Attorney for the
      Southern District of New York
HAGAN C. SCOTTEN
RACHEL MAIMIN
      Assistant United States Attorney

JUDITH VARGAS
      Attorney for Defendant
      -and-
GEORGE R. GOLTZER
      Attorney for Defendant
      -and-
YING STAFFORD
      Attorney for Defendant

I43QBURs

```
1              (Case called)
2              MR. SCOTTEN:  Good afternoon, your Honor.  Hagan
3    Scotten and Rachel Maimin for the government.
4              MS. MAIMIN:  Good afternoon.
5              THE COURT:  Good afternoon to you both.
6              For the defendant.
7              MS. VARGAS:  Good afternoon, your Honor.  Judith
8    Vargas and Mr. George Goltzer for Mr. Nico Burrell.
9              THE COURT:  Good afternoon to you both.
10             And good afternoon, Mr. Burrell.
11             THE DEFENDANT:  Good afternoon.
12             THE COURT:  We are here today for sentencing in United
13   States v. Nico Burrell, 15 CR 95.
14             In preparation for today's proceeding, I have reviewed
15   the probation report which is dated -- I'm using the amendment
16   date -- December 29, 2017.
17             In addition, I have received and reviewed the
18   following submissions:  I have the defendant's primary
19   submission, which is dated March 27, 2018, and it has the
20   following attachment exhibits:  Exhibit A is an extensive
21   mitigation report by Kathleen O'Boyle, and that document has
22   exhibits as well, which I have reviewed.  Included in that are
23   a number of historical documents pertaining to Mr. Burrell, as
24   well as an extensive number of letters from family members and
25   loved ones.  That all constitutes Exhibit A to the defendant's
```

I43QBURs

1   submission.

2         Exhibit B is the objections and comments to the

3   presentence report.

4         Exhibit C includes a number of certificates of

5   achievement and participation.

6         Exhibit D is a DVD which includes video statements of

7   family members and colleagues.

8         Then, additionally, from the defense I have a letter

9   dated March 28, 2018 which withdrew some of the remarks,

10  comments, assertions made in the sentencing submission.  And

11  then I have a March 30 supplemental submission which includes a

12  letter from Focus Forward, as well as a list of books that

13  Mr. Burrell read.

14        I should note among the exhibits, the letter exhibits

15  to the O'Boyle report was a letter from Mr. Burrell that I

16  read.  And that's what I have from the defense.

17        From the government, I have its primary submission

18  which is dated March 30, 2018.  It too has exhibits.  Exhibit A

19  was a video provided.

20        And Exhibit B which is attached is a transcript from

21  the Moye proceeding, which involves the incident of a witness

22  assault that is discussed and relevant to the sentencing here.

23        Counsel, is there anything else I should have in front

24  of me for purposes of sentencing?

25        MR. SCOTTEN:  Not from the government, your Honor.

I43QBURs

1          MS. VARGAS:  Nor for the defense, your Honor.

2          THE COURT:  Can you confirm, please, that you've

3     received each other's submissions?

4          MR. SCOTTEN:  The government has, your Honor.

5          MS. VARGAS:  Yes, your Honor, from the defense.

6          THE COURT:  Thank you.

7          We will turn first to the presentence report,

8     Ms. Vargas.  I ask this only as a matter of record.

9          Have you reviewed the presentence report?

10         MS. VARGAS:  Yes, I have, your Honor.

11         THE COURT:  And you've discussed it with your client?

12         MS. VARGAS:  Extensively.

13         THE COURT:  Mr. Burrell, you've had a chance to review

14    the presentence report?

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  And raise any issues or concerns with your

17    counsel?

18         THE DEFENDANT:  Yes, I have.

19         THE COURT:  For the record, Mr. Scotten, you've

20    reviewed the presentence report?

21         MR. SCOTTEN:  Yes, your Honor.

22         THE COURT:  We are going to put aside for a moment the

23    calculation of the Sentencing Guidelines.  Ms. Vargas, I want

24    to ask what continuing objections you have to the presentence

25    report regarding factual accuracy.

I43QBURs

1          MS. VARGAS:  We have none at this time, your Honor.

2          THE COURT:  OK.  I do just want to confirm, because

3    obviously there were some that were withdrawn and some that are

4    discussed in the government's sentencing submission, to make

5    sure that I have a full understanding of your position with

6    respect to them.

7          So one of the issues that's discussed is the question

8    of Mr. Burrell's leadership in BMB.  The plea agreement

9    indicated as part of its calculation a leadership enhancement.

10   I had understood your argument in the sentencing submission to

11   be, yes, he has admitted to a leadership, but we still think

12   you should put what's included in the PSR in perspective in

13   understanding that role.  Is that a fair reading?

14         MR. GOLTZER:  Your Honor, George Goltzer for

15   Mr. Burrell.  We entered into a series of stipulations after

16   the conclusion of extensive negotiations with the government in

17   terms of what would be an appropriate disposition by a

18   government-defense plea agreement.  We are not asking to back

19   off our position on leadership or the assault situation.

20         THE COURT:  OK.

21         MR. GOLTZER:  However, we have a difference of degree.

22   There's leadership and then there is extensive leadership and

23   mild leadership.  We are going to is discuss it in our remarks.

24         As the stipulations are concerned, we abide by those.

25         THE COURT:  To the extent there are facts contained in

I43QBURs

```
 1    the PSR that go to -- the factual record from which you'll make
 2    those arguments, you don't contest those facts.
 3              MR. GOLTZER:  It's a little more nuanced than that,
 4    but basically no.  I'll be addressing that, and Ms. Vargas will
 5    be addressing it, if you permit us, and I think it will become
 6    clear there is no need for a Fatico.
 7              THE COURT:  That's the primary question.  I want to
 8    make sure before I adopt the factual recitation set forth in
 9    the PSR that there is no request for a Fatico hearing with
10    respect to those facts.
11              MR. GOLTZER:  We intend to mitigate things somewhat,
12    but we're not asking for a Fatico.  There is no objection to
13    your accepting the recommendations factually in the presentence
14    report.
15              THE COURT:  And you've discussed these issues with
16    Mr. Burrell?
17              MR. GOLTZER:  Ms. Vargas has done the very heavy
18    lifting.  I was learned counsel.  We didn't want to duplicate,
19    but she has spent an inordinate amount of time with
20    Mr. Burrell, and I discussed it with him yesterday.
21              THE COURT:  Just to complete the record then,
22    Ms. Vargas, you've discussed with Mr. Burrell that he would be
23    entitled to a factual hearing, a Fatico hearing, as it's
24    called, with respect to any material facts that would affect my
25    sentencing in such a hearing, it would be the government's
```

1   burden to prove those facts by a preponderance of the evidence.

2           MS. VARGAS:  I have, your Honor.  We have discussed

3   it.

4           THE COURT:  Mr. Burrell, you're not seeking any sort

5   of Fatico hearing?

6           THE DEFENDANT:  No, ma'am.

7           THE COURT:  Thank you.

8           I adopt the factual recitations set forth in the PSR.

9   Hearing no objections, the report will be made a part of the

10  record in this matter and placed under seal.  If an appeal is

11  taken, counsel on appeal may have access to the sealed report

12  without further application to this, court.

13          Turning to the guideline calculation.  As counsel is

14  aware, I am no longer required to follow the United States

15  Sentencing Guidelines, but I am still required to consider the

16  applicable guidelines in imposing sentence.  I must, therefore,

17  accurately calculate the sentencing guideline range.  Here, we

18  do have a discrepancy between the parties' stipulated guideline

19  calculation and the calculation contained in the PSR, and I do

20  want to ask the parties about their view as to the -- I want to

21  make sure I understand the calculation contained in the PSR so

22  that I could make my own evaluation as to the appropriateness

23  of what's included and to the extent I have questions, I would

24  value counsels' honest responses to my question and wouldn't

25  consider any such response a breach of the plea agreement.

I43QBURs

1          And as I understand it, the discrepancy here is that

2     the parties stipulated to an inclusion of an upward departure

3     with a caveat that there was a typo in the plea agreement,

4     based on what I gather was meant to be 5K2.0(a)(2)(A) on the

5     theory that the assault of the witness for a separate federal

6     offense is not otherwise accounted for in the guideline

7     calculation.  Is that correct?

8          MR. SCOTTEN:  That is correct, your Honor.  I can

9     elaborate, but I think you have it right there.

10         THE COURT:  And probation disagrees with the inclusion

11    of that upward departure on the basis that -- I'm just reading

12    from page 35 of the PSR.  "Although the parties included the

13    MCC assault in their guideline calculations, we did not, as the

14    assault took place outside of the operative dates of the

15    instant offense."  And probation has included that it is a

16    factor that should be considered pursuant to 3553(a) instead.

17         So what is the basis -- I mean, it is true that it

18    occurred outside the scope of the offense, obviously, given

19    that it's during pretrial incarceration for the offense.  Is it

20    factually related in any way in this case to this charge?

21         MR. SCOTTEN:  It is not factually related, your Honor,

22    in the sense that this assault was not motivated, so far as we

23    know, and we have a sense of what motivated it by any attempt

24    to prevent witnesses from testifying against Mr. Burrell or any

25    other member of this enterprise.

I43QBURs

1          We do think it is related in the sense that, as the

2     Court has become very familiar, BMB has this creed of

3     anti-snitching and it is very much part of being a member of

4     the gang and broader ethos, and this assault was an effort at

5     intimidation by a proponent of that creed who developed it

6     while leading the gang.

7          At the same time, I should note I'm not sure the Court

8     needs to resolve the legal disagreement, to the extent there is

9     one, between the PSR and the parties, because the whole idea of

10    the relevant guidelines provision essentially is that the

11    parties are stipulating to something that would not perhaps

12    otherwise be included.  It gives the Court the authority to say

13    perhaps I would not normally add these three levels, but the

14    parties have agreed here it's relevant.  We certainly think

15    it's relevant to the assessment of the defendant's culpability,

16    and the parties agreed it should be included in the analysis.

17    So I think the Court is free to accept that stipulation, not

18    because the Court would come to it independently but because

19    there's a guideline provision that allows the parties to put

20    such stipulations before the Court.

21          THE COURT:  So, I mean, just so I understand it, under

22    that theory, you could put any unrelated -- I mean, anything

23    you deem related, even if sort of subjectively one would deem

24    it unrelated, before the Court, and I should include it in my

25    calculation without any independent assessment of relatedness

I43QBURs

```
 1  in any way?
 2           MR. SCOTTEN:  I don't think so, your Honor.  I think
 3  the Court, as you've already made clear, has to come to it's
 4  own calculation, and you can assess the reasonableness of the
 5  parties' stipulation.  If we entered a stipulation that
 6  someone's guidelines should be enhanced for two levels because
 7  they're a fan of the wrong sports team, the Court would look at
 8  that say, "That's absurd.  I'm not going to do it."
 9           Here, I guess what I'm suggesting is the parties
10  stipulation is reasonable.  It is not wholly unrelated to the
11  conduct at issue here.  Mr. Burrell by his plea accepted it as
12  one of the predicates.  It's not something that's unrelated in
13  the sense totally divorced.
14           THE COURT:  You say accepted it as one of the
15  predicates.  As part of the stipulated guideline range, not as
16  part of the allocution to the offense.
17           MR. SCOTTEN:  That is correct.  And perhaps I should
18  back off from that because the mere fact that it is used to
19  calculate his guidelines does not necessarily make it a
20  predicate.  It merely requires that it be relevant conduct.
21           THE COURT:  I guess just at base, what you understand
22  the stipulation to mean is that the parties agreed that it is
23  connected conduct that is not otherwise accounted for in the
24  guideline calculation and therefore appropriately assessed as
25  an enhancement.
```

I43QBURs

1          I tried to find some authority on the question, and

2     the closest I found was a circuit summary order in a case

3     called *United States v. Robinson*, 428 Fed. Appx. 103.  It's, as

4     I said, a summary order, and somewhat comparable circumstances,

5     but it does talk about -- it says:  The district court did not

6     abuse its discretion in imposing the departure based on violent

7     conduct which was aided by a fellow gang member and intended to

8     intimidate an inmate witness who reported a prior assault by

9     the defendant.

10          So, I think I just read that as saying there's got to

11    be some nexus, some connection between the conduct to be

12    considered in the upward departure, and I wanted to make sure I

13    have a sufficient factual record for that inclusion.  I think

14    what you're saying is I have the stipulation of the parties.

15          MR. SCOTTEN:  I do also think you have a factual

16    record.  If you hadn't had it, we gave you an exhibit of the

17    transcripts.  You know factually what happened there.  I think

18    the question isn't lack of factual basis in the sense of the

19    Court knowing what happened.  I do think the Court has to make

20    some conclusion that there is a reasonable relation here.  I

21    think I've offered that to the Court.

22          THE COURT:  So what would you say is the test?  You

23    just said reasonable relation.  Is that what you would say is

24    the test?

25          MR. SCOTTEN:  So, like your Honor, we tried to find

1    some authority on this that would give us an actual test, and I

2    don't want to put specific words on it because I didn't find

3    any authority that gave me those specific words.

4              I think the question is the parties have essentially

5    agreed this is relevant conduct, and it is not adequately

6    reflected in the guidelines.  I think the Court's question

7    really goes to relevant conduct.  I think that it's not

8    reflected in the guidelines is clear from the calculation.  I

9    think this does meet the test of relevant conduct because it

10   comes out of the defendant's membership in the gang.  I think

11   his actions here are motivated by this tenet of the BMB

12   membership, or at least explained in part by this tenet of the

13   BMB membership, this anti-snitching policy.  I think if the

14   Court accepts it's relevant parties or at least the parties'

15   stipulation that it's relevant conduct is reasonable, it has no

16   reason to reject the stipulation.

17             THE COURT:  Who will I hear from on this?

18             MR. GOLTZER:  I will address it, your Honor, and I may

19   address it in a way that may not be satisfactory to the Court

20   because I find myself in a rather awkward and uncomfortable

21   position, and it's this:

22             From the beginning, this was a very difficult case for

23   Mr. Burrell on a lot of levels.  He was placed, we think,

24   inappropriately at the apex of what the government

25   characterized as the largest gang take-down in the history of

1      the Republic.

2              We entered into very extensive negotiations with the

3      government in good faith, and we think that they engaged in the

4      same kinds of negotiations with us.  They were not easy

5      negotiations.  There were contested matters of fact between the

6      government and the defense, and we both tried to accommodate

7      each other to reach what we felt would put the Court in a

8      position to fashion an appropriate guideline sentence,

9      variances aside for the moment.

10             We both have to be bound by whatever decision the

11     Court makes on how it wishes to factor in this particular

12     guideline.  I want to be very candid with the Court and state

13     that it may be somewhat academic because the guidelines are no

14     longer mandatory.  We are going to accept, obviously, whatever

15     decision the Court makes with respect to this guideline.  If

16     the Court rules against us, we have stipulated out of appealing

17     that issue, and we would not appeal that issue.  So I want to

18     put that on the table because I don't want to be in the

19     position of breaching the plea agreement, even though the Court

20     says a candid answer won't do that.

21             There was a fight.  In fact, there were two fights.  I

22     don't think the government is going to contest that.  There was

23     a correction officer who observed Mr. Burrell fighting with the

24     prospective witness in the other case.  It is clear from that

25     person's testimony that Mr. Burrell during the fight complied

1    with the order way back in January of 2017 to stop fighting and

2    walk away, and he was the only person that did that.  In fact,

3    that was the second fight.  There was an earlier fight between

4    the prospective the witness and I believe the other gentlemen,

5    that Mr. Burrell was not involved in.

6            To the extent that we have stipulated that the fight

7    may have been in part caused by that person snitching, we're

8    accepting that stipulation.  We're not going to argue with

9    that.  To the extent that the government says that there was a

10   preexisting conspiracy, we're not there.

11           To the extent that the organization or the gang or the

12   enterprise, as do all of these enterprises in the streets of

13   New York, have a view about so-called snitching, to the extent

14   that the Court wants to accept that as somehow being relevant,

15   we won't appeal that either.  And I think that when the icing

16   is scraped from the cake with respect to this very complex

17   young man, there is a lot more to talk about than what caused

18   this fight.

19           THE COURT:  You're right, that was not satisfying.

20           MR. GOLTZER:  My apologies.  It's the best I can do.

21           THE COURT:  It's also not wrong and -- I mean, at

22   base, I think it is academic because the stipulated-to facts of

23   this incident will be a part of my sentencing conclusion

24   whether it's accounted for here in the guideline calculation or

25   as a 3553(a) factor.  I'm confident that whichever way I do

I43QBURs

1    that, the ultimate sentence will come out to be the same, and I

2    am required to accurately calculate the Sentencing Guidelines.

3          MR. GOLTZER:  I appreciate that, but the Court knows

4    I'm walking a tight rope here.

5          THE COURT:  I do.  And I sought your input with the

6    assurance that your responses to my questions wouldn't be a

7    breach of the plea agreement, and you've given me that.

8          So am I right that other than that issue, the

9    calculation contained in the PSR is in accord with the parties'

10   stipulated calculation?

11         MR. SCOTTEN:  I think so, your Honor.

12         THE COURT:  That was lacking a certain level of

13   confidence.

14         MR. SCOTTEN:  Yes, your Honor.  It reads exactly the

15   same.

16         THE COURT:  Mr. Goltzer.

17         MR. GOLTZER:  Yes.

18         THE COURT:  And I presume then there are no objections

19   to the calculation.  Bracketing that issue, there are no

20   objections to the calculation.  Is that correct?

21         MR. GOLTZER:  Yes.

22         MR. SCOTTEN:  Yes.

23         THE COURT:  All right.  I do think that in light of

24   the factual record established here, as well as the parties'

25   stipulation to the applicability of the upward departure

I43QBURs

1    pursuant to 5K -- and we'll get this right without the typo.

2    Let me just make one final point of clarification.  The

3    government has represented that the plea agreement contained

4    the typo and the (a) was wrongly reflected I think as (d).

5         Mr. Goltzer and Ms. Vargas, you agree that what the

6    parties intended to stipulate pursuant to with respect to this

7    provision was 5K2.0(a)(2)(A)?

8         MS. VARGAS:  Yes, your Honor.

9         THE COURT:  Just to finish the earlier sentence:  In

10   light of the facts contained in the presentence report, which I

11   have adopted, in light of the parties' stipulation to this fact

12   and my best reading of the available case law, I do believe it

13   is appropriate to include this upward departure based on the

14   aggravated assault on a witness in another federal case in

15   light of the contention that this is sufficiently relevant

16   conduct not adequately taken into account otherwise in the

17   guideline calculation.

18        I, therefore, am going to, based on the parties'

19   agreement, the absence of objection and my independent

20   evaluation of the sentencing guidelines, I do accept the

21   calculation contained in the parties' plea agreement.  And for

22   the reasons outlined in that plea agreement, I adopt that

23   calculation process that's outlined in the parties' August 14,

24   2017 agreement.  Accordingly, using the November 1, 2016

25   edition of the Sentencing Guidelines, the offense level here is

I43QBURs

```
1    31, the Criminal History Category is III, and that produces a
2    guideline range of 135 to 168 months.
3              I should note also that the parties agree that
4    whatever sentence I impose pursuant to 5K2.23, the parties urge
5    that I subtract the full amount of time that Mr. Burrell served
6    for the 2009 conviction from the ultimate sentence here.  Is
7    that correct?
8              MR. GOLTZER:  Yes.
9              MR. SCOTTEN:  Yes, your Honor.
10             MS. VARGAS:  Yes, your Honor.
11             THE COURT:  And that is 66 months and some number of
12   days.  Is that right?
13             MR. SCOTTEN:  Yes, your Honor.
14             MR. GOLTZER:  Yes.
15             THE COURT:  So other than the upward departure I found
16   and the downward departure pursuant to 5K2.23 that I will
17   include and calculate, I do not see any other basis for an
18   upward or downward departure.
19             Is any further departure urged by the parties?
20             MR. SCOTTEN:  No, your Honor.
21             MS. VARGAS:  No, your Honor.
22             THE COURT:  As I've said, I've otherwise considered
23   whether there's any additional basis for a formal departure
24   from the advisory range within the guideline system and didn't
25   find grounds warranting a departure under the guidelines.  The
```

I43QBURs

1    parties' plea agreement leaves them free to argue for a

2    variance, and I think both sides do argue for a variance -- the

3    defense for a downward variance and the government for an

4    upward variance.

5              And with that, I will hear from you, Mr. Hagan.

6              Mr. Hagan, I'll hear from the government.

7              MR. SCOTTEN:  OK.

8              So, your Honor, I'll be fairly brief.

9              THE COURT:  I'm sorry, Mr. Scotten, I do that.

10             MR. SCOTTEN:  Because my parents gave me a last name

11   for the first name.  Happens all the time, your Honor.

12             THE COURT:  Yes.

13             MR. SCOTTEN:  So I will be fairly brief.

14             You have our submission, and since our submission

15   comes last, I don't think there's a lot of unaddressed points

16   from the defense out there.

17             So I just want to stress a couple things.  The first

18   is that the government believes a sentence of 14 and a half

19   years is appropriate here.  We said that in our submission, but

20   there are a couple points about that I want to stress.  I think

21   the Court is aware requesting an above-guideline sentence is

22   not a step we take likely.  It requires approvals a couple

23   levels above the people sitting here.  I think throughout this

24   case we have been very reasonable in our sentencing requests,

25   often pointing out when one defendant is like another, knowing

I43QBURs

full well that will result in a below-guideline sentence

because the Court has already applied a below-guideline

sentence to the prior defendant, and generally taking the view

that the Court's practice of sentencing, especially non-violent

drug offenders to below-guideline sentences, that we've sort of

accepted that and not disagreed with it as a systemic matter.

I've talked to Ms. Maimin, we're not a hundred percent certain

on this, but we believe it's the only time in this case we've

asked for a variance.

THE COURT:  I have upwardly varied once but not at the

government's request.

MR. SCOTTEN:  That is my recollection as well, your

Honor.

I want to stress for reasons I'll get to in a minute

and we've explored fully in our submission, we believe a 14 and

a half year sentence is appropriate.  I know sometimes some

judges may feel "If we shoot here, hoping the Court will come a

little bit below that."  That is not the case here.  We're not

asking for 14 and a half years hoping the Court will decide 12

is appropriate.  I understand the Court will make its own

judgment.

Our view is the gravity of this defendant's offenses

relative to the statutory count to which he has pled guilty are

as severe as the Court might expect to see.  There are, of

course, worse crimes in the racketeering conspiracy, and the

I43QBURs

1    Court will sentence at least several defendants who have

2    committed murders or more serious crimes than that; but within

3    the realm of racketeering conspiracy, I think the harms the

4    defendant has inflicted are remarkably severe.

5            The Court knows that the defendant shot two people;

6    one of them innocent.  And then went back to the gang life

7    after shooting an innocent woman in the arm and failing to kill

8    a young man, really, a boy, he chose to return to this gang and

9    to lead it.  I'm not going to go into more detail of the

10   destructiveness of prescription opiates he sold, and I do think

11   they fully warrant the guidelines, and that we are sort of

12   going from there based on all the other crimes, but I do think

13   the Court should hold the defendant accountable under Section

14   3553(a) for his leadership role in propagating violence, for

15   coming back from prison saying, "I shot two people.  Do what I

16   do did;" for continuing to not only sell drugs but urging

17   others to do so in his videos; and really for this wave of

18   violence that overtook the community -- murders, shootings,

19   stabbings, assaults.  The Court has seen the consequences of

20   this, and often I think that confronted with lower-level

21   defendants who, to some extent, may have felt to the Court and

22   certainly to themselves like they were caught up in something.

23           This is the defendant who founded that gang.  If you

24   want to see why that happened, it is sitting in the courtroom

25   here today.  It is this man who helped bring all that misery

I43QBURs

1   into the community.  And I'm not going to talk a lot more about

2   all the crimes this Court has sentenced for, crimes which in

3   some cases the Court might have felt the defendant sitting in

4   that chair was to a degree a victim himself.  To the degree

5   those defendants were victims, they were caught up in

6   something, this is the perpetrator of the crime against them as

7   well.

8          What I think I want to stress before I sit down, maybe

9   hit one more point, is another line from the defendant's

10  videos, and one that is not in the PSR.  We didn't stress it in

11  our submission because on its face, it's not even that

12  criminal.  In one of the defendant's videos, he has a refrain

13  where he talks about how he walks by other men, they don't

14  talk; they just mumble.  When he walks by regular people,

15  people who aren't important members of the BMB like him, people

16  who aren't feared gangsters, they can't hold their heads high.

17  They can't meet him eye to eye.  They can't talk to him.

18  They're not his equal.  They have to look down.  That is the

19  huge amount of damage this defendant did.

20          To stay in that community, if you want to be a big man

21  if you want to be a proud person, if you want to hold your head

22  high, you've got to be a part of this gang.  If you're somebody

23  who goes to work, who goes to school, who doesn't start fights,

24  who doesn't sell drugs, you look down and you mumble.  We're in

25  charge of this neighborhood.  Not you.  That kind of

I43QBURs

1    destructive behavior that can infect an entire community is a

2    big part of what this Court should be punishing today.

3             And I suppose the last thing I would say -- I don't

4    want to repeat it because I think we said it a lot in our

5    sentencing submission, but, your Honor, as you hear this

6    defendant speak today, as you hear his attorneys try to make

7    the case that he's been rehabilitated in prison, I urge the

8    Court to consider the fact that it's all been said before when

9    he got a reasonable five-year sentence for an attempted murder

10   and yet he came back out of it and started doing the same

11   things again, when he came back out of that sentence and

12   started selling drugs, carrying guns, making these videos and

13   encouraging other people to repeat what he did, leading a gang

14   that was in an ongoing war that resulted in multiple deaths.

15            I'm not going to tell the Court not to consider what

16   these attorneys and this defendant say.  Of course, it will.

17   But I do think the Court should constantly take it with a grain

18   of salt, knowing those things have been said before and knowing

19   all the havoc that ensued when the Court to some degree gave

20   credence to them.

21            Subject to the Court's questions, I have nothing

22   further.

23            THE COURT:  Thank you.

24            Ms. Vargas.

25            MS. VARGAS:  Your Honor, I'm going to address the

1    Court, but Mr. Goltzer would also like to address the Court.

2              THE COURT:  I'm fine to hear from you both.

3              MS. VARGAS:  Thank you, your Honor.

4              Your Honor, the first thing that I'd like to say in

5    response to the government's statement just now is, in sum and

6    substance, the government would like to implicate Mr. Burrell

7    for every single act of violence that occurred in this case,

8    except the one fact that they don't discuss is that Mr. Burrell

9    was incarcerated from 2009, which was the supposed inception of

10   this conspiracy up until 2014, for nearly six years, which is

11   most of the duration of this conspiracy.  And what's

12   interesting, or what's curious, is that what they rely on to

13   implicate all of this misery and all of this suffering that

14   Nico Burrell allegedly caused this neighborhood are video

15   statements.  Video statements, your Honor.

16             We stated in our submission, we discussed this

17   extensively, these were simply statements of expressions of

18   art, expressions of speech, bombastic theater, if you will, and

19   nothing more.  And there's no evidence to prove otherwise.

20   There's no evidence to prove that because of these videos,

21   therefore, 62 other defendants in this case went out and

22   committed the violence that they committed.  I say that's a

23   stretch.

24             THE COURT:  I do understand that point.  And to the

25   extent that I have considered comparable evidence in other

I43QBURs

1    sentencings, I have essentially taken it for the proposition

2    that it is an extolling of gang violence, a sort of glorifying

3    and extolling of others to engage in gang violence and other

4    illegal activity.  I think it appropriate to consider it

5    comparably here and not as proof itself that somehow

6    Mr. Burrell, apart from what flows from his stipulation to a

7    leadership role, is responsible for everything that occurred,

8    right?

9          So, there's two facts.  There's a fact he stipulated

10   to a leadership role, and I've sentenced other leaders of the

11   gang, particularly when there are acts of violence, to very

12   substantial sentences because as some level the gang violence

13   does flow from the leadership.  So there's that fact.  And the

14   government has often, I think, tried to do a lot with it, but

15   from my perspective, it's a sense of -- it's at least a

16   glorification of the violence and extolling the violence as

17   sort of encouragement to others to engage in gang activity.

18         MS. VARGAS:  Your Honor, no more than any other

19   artists that are out there today that are engaging in the same

20   type of videographic content, considered superstars in today's

21   day and age, and utilizing the same type of hip-hop, rap music

22   video content.  Jay-Z is a perfect example of this.  Snoop Dog.

23         THE COURT:  But Jay-Z's -- they're not a leader of

24   violent gangs.

25         MS. VARGAS:  Who knows, Judge?  What I'm saying is the

I43QBURs

1    video in and of itself doesn't speak to much.  Is Nico Burrell

2    perhaps guilty of enjoying an inflated reputation by other

3    children in his neighborhood who learned about how he did a

4    five and a half year stint in jail for an attempted murder?

5    Yes, more than likely.  But guilty of extolling violence

6    because of something that he rapped on a video?  Did he mimic

7    other artists that were also engaged in the same type of

8    artistry?  Absolutely.  Many artists in today's day and age.

9    But extolling violence I think that is a lot to say for him,

10   and I think it's misput.  I think it is not an accurate

11   assessment.

12          Mr. Burrell was incarcerated for five and a half years

13   for the attempted murder shooting, which is a part of our

14   stipulation -- which is relevant conduct, actually.  We

15   stipulated to that as relevant conduct.

16          THE COURT:  Right.

17          MS. VARGAS:  When he leaves the prison -- and this is

18   the part that the government wishes the Court to consider as

19   his most heinous period in his history of this conspiracy.

20   When he leaves the prison, he now comes home and starts doing

21   these music videos.  Yes, we are not disputing that in any way.

22   We have the videos.

23          Do we like the music?  We don't have to.  Maybe some

24   of us don't.  But we don't have to like it.  What we have to

25   see it for is what it's worth.  It's simply videos, which many

I43QBURs

1    other Black artists, particularly Black artists who have come

2    out of inner city neighborhoods like the one that Nico Burrell

3    came from, many of them engage in this type of videographic

4    content.

5            So I think that it's interesting that the government

6    really hangs its hat on this because there is nothing else that

7    they can hang their hat on.  There is nothing else that they

8    can say that Nico Burrell was doing in the two years that he

9    was out.

10           THE COURT:  Well, again, just to be clear, he

11   stipulated to a leadership role.

12           MS. VARGAS:  Yes, your Honor.  We're not pushing back

13   from the stipulations, as Mr. Goltzer just told the Court a few

14   moments ago, but we have to put everything in perspective.

15           And the government would like -- the Court has to take

16   the mandate and consider under the law the 3553 factors, but

17   there is not just one factor to consider, and the Court would

18   like it to simply be the nature and circumstances of the

19   offense.  There's more under 3553.  And under 3553(a) it's

20   nature and circumstances of the offense and history and

21   circumstances of the defendant.  That has to be considered as

22   well in tandem with all the other factors.  And we submit that

23   if the Court takes everything into consideration, it cannot do

24   as the government is asking.

25           First of all, with respect to what they are asking,

1    the government is asking for a variance.  In a sentencing memo

2    it is actually seeking an upward variance basing its request

3    upon all of the conduct that we stipulated to as enhancements

4    and upward departures, such as the four-point leadership role,

5    which we are stipulating to and which we stand by, the

6    two-point weapons enhancement, which we stipulated to and we

7    stand by, and an upward departure to level 34 for the fight at

8    MCC.

9              So the defense does take issue with the government's

10   claim that it seeks a variance based on those factors because

11   we believe that what the government is doing is indirectly

12   seeking a forbidden guideline departure under the guise of a

13   variance by using the stipulations that defense counsel entered

14   into to raise the guidelines levels to essentially double count

15   the stipulations.  We believe that this is a violation of the

16   spirit and letter of the plea agreement.  And by way of

17   example, the government should not be allowed to use the

18   leadership enhancement twice, which is what it seems that it is

19   doing in this case -- once to gain a higher guideline range and

20   the second time to achieve a variance, and this has been

21   repeatedly done in the government's sentencing memo.  Yes, we

22   both agreed that either party could ask for a variance.  Yes.

23   That's on page 5 of the plea agreement.

24             THE COURT:  I guess I do need to understand if you're

25   contending that the government has breached the plea agreement,

I43QBURs

```
1    and then if you are, we need to consider the possible --
2              MS. VARGAS:  What we're saying, your Honor, is that
3    what they are asking for violates the spirit of the plea
4    agreement in that they are going above and beyond a variance.
5    They are asking for a sentence starting at the max at 20 years
6    and then asking for that sentence to be reduced by the 66-month
7    departure.  But the basis for that variance they're cloaking
8    under the 3553 factors, although we stipulated to those
9    enhancements that they are now calling 3553 factors.
10             THE COURT:  I think we need to deal with whether you
11   are making a formal assertion that the government has breached
12   the plea agreement.
13             MR. GOLTZER:  We are not stating that they have
14   breached the agreement, your Honor.  We are simply pointing out
15   what the government is doing in its sentencing memorandum.
16             THE COURT:  I guess I just want to make sure.  So, for
17   example, you do here, and in almost every sentencing proceeding
18   I have, defense will argue for me to take into account the
19   3553(a) factors, the defendant's genuine acceptance of
20   responsibility and remorse, right?  I presume you do want me to
21   take that into account in the 3553 factors, correct?
22             MS. VARGAS:  Yes.
23             THE COURT:  That's not a spirit breach of the plea
24   agreement, is it, even though it's part of the stipulated to
25   guideline calculation for a reduction of the calculation as a
```

I43QBURs

1    result of that stipulation.  Even though it's a sort of double

2    counting of acceptance, I've never been asked to deem that a

3    breach of the spirit of the plea agreement by the government

4    even though almost every sentencing I encounter, the defense

5    wants me both to formally calculate that into the guideline and

6    take into account in varying below the guideline range.

7           MS. VARGAS:  Except that in this case what the

8    government is asking the Court to do is exclusively in their

9    sentencing submission, they discuss his leadership, so,

10   therefore, the Court should sentence him at the highest

11   possible sentence because of his leadership role.  We

12   stipulated to the four-point leadership enhancement.  Then they

13   say because of the weapons in the case.  We stipulated to the

14   two-point weapons enhancement in this case.  Then they talk

15   extensively about the assault at MCC.  Not only did we

16   stipulate to an enhancement, it was up to a level 34

17   enhancement.

18          So it's not just that I'm saying, your Honor, please

19   take into consideration his remorse.  It's almost as if I were

20   saying, your Honor, I would like you to please take into

21   consideration the 5K2.23 downward departure, 66 months.  But

22   also I'm asking for another 66 months as a variance because of

23   and I use the exact same reasons.  That's not what we're doing

24   here.  We gave the Court an extensive sentencing memorandum

25   outlining specific reasons as to why Mr. Burrell merits a much

I43QBURs

1    lesser sentence.  And when we entered into this plea agreement,

2    we understood that the 66-level reduction -- not that it was

3    going to come from a sentence of 20 years.  That's outrageous.

4    We understood that the 66-level reduction was going to come

5    from the stipulated guidelines range.  In fact, that's what it

6    says in the plea agreement.  It is understood that the defense

7    will ask for a downward departure from the stipulated

8    guidelines range.  And now it seems that because we filed a

9    sentencing memorandum asking for a variance that now the

10   government is asking for an even higher variance because of

11   that, which we were absolutely permitted to do.

12            THE COURT:  Yeah, I mean you're both permitted to do

13   it by the tone of the agreement.

14            MS. VARGAS:  We would like the Court to consider

15   everything.  We feel that in stipulating to the plea agreement,

16   we have agreed to conduct; Mr. Burrell had never denied the

17   conduct.  He stipulated to the leadership role.  He stipulated

18   to the weapons.  He was, in fact, convicted of an attempted

19   murder in 2009, and he stipulated to the conduct that we just

20   discussed extensively.

21            But there is more to Mr. Burrell than what the

22   government would have the Court consider.  Much more.  He is

23   not simply this guy who came out of jail, and he's rapping

24   about videos and encouraging 63 other defendants to shoot

25   people and commit the other crimes discussed.

1              We hired an independent expert, a professional former

2    United States Probation and Pretrial Services officer who is

3    now an expert in this field to conduct an in-depth

4    investigation into Nico Burrell's entire history.  And she

5    wrote a comprehensive report, 14 pages practically

6    single-spaced, where she concludes that based upon all of the

7    factors in this case, the case included -- that based upon all

8    of those factors, including the offense, as I just said, as

9    well as his difficult childhood and his incarceration which now

10   spans 90 months, that Mr. Burrell has grown, is well on the

11   path to rehabilitation and absolutely should be given the

12   opportunity to continue on this path of learning and growth.

13             She states, and I quote, "Mr. Burrell has spent a

14   total of 90 months -- 66 months in New York State Department of

15   Corrections Prisons and 24 months in MCC detention -- behind

16   bars, the past two years in harsh conditions of high security

17   detention at the MCC.  Based on his limited involvement in the

18   conspiracy following his release from prison in 2014, his

19   impressive rehabilitation efforts and what may be a

20   once-in-a-lifetime chance of turning his passion for music into

21   a lucrative career, further incarceration may not only be

22   unnecessary to accomplish sentencing goals but may actually

23   impede Mr. Burrell's continued rehabilitation and diminish his

24   future prospects for leading a successful, law-abiding

25   life."This is coming not from his defense advocates.  This is

1    coming from a reputable expert, a professional, a former United

2    States Pretrial Services and Probation officer.

3            Yet, the government does not seem to acknowledge any

4    of this.  It will not acknowledge any of the difficulties in

5    his life; the fact that in his preteen years, not one, but both

6    of his parents were deported to Jamaica.  He has never seen his

7    mother again.  And that was at the age of 13 or 14 years old.

8    The government refuses to acknowledge that his stepfather, who

9    was the only role model in his life after his father's

10   deportation, has been serving since then a 27-year jail

11   sentence.  They will not acknowledge that.  They will not

12   acknowledge that this young man had been most of his entire

13   life living in homeless shelters, including the weeks prior to

14   when he was arrested on this case.  They will not acknowledge

15   any of the strides that he made while he was incarcerated in

16   two of the most notoriously violent prisons in this state:

17   Rikers Island, the embattled Rikers Island, where he spent two

18   years at the age of 16.  He was a child.  They will not

19   acknowledge that.  Two more years and change at Clinton

20   Correctional Facility, a notoriously violent prison, at the age

21   of 18 when most of us at that age were looking to get into

22   colleges.

23           They won't acknowledge any of the strides that he's

24   made while incarcerated in the past 24 months.  In fact, they

25   appear to mock him in the sentencing memo.  Yes, he is a

voracious reader.  He has read an astounding 120 books, a fete
that's incomparable for many of us, and, of course, yes, he has
time in prison, but that's still something to acknowledge.

He participated in one of the most
difficult-to-get-into programs in federal prison today, The
Focus Forward Project, and he was one of the two valedictorian
speakers at the graduation ceremony that I was actually
fortunate enough to be allowed to attend because no one from
the outside is ever allowed to attend these proceedings.  And
he's received certificates from other courses as well.  I
submitted those to the Court with our sentencing submission.
He's mastered the game of chess.  The government was mocking
him about that as well.  He's highly intelligent.  He's highly
motivated in every way to excel because he knows, and he
accepts his past conduct, and he knows that what he did was
wrong.

Now, the government says in its sentencing memorandum,
well, that's true, but he was this grand leader.  Well, why
isn't it also proof that he has the capacity to rehabilitate;
that he has the capacity to grow.  His most serious offense is
the prior conviction from 2009 for the attempted murder which
the parties stipulated is relevant conduct.  He served five and
a half year prison sentence for that as a 16-year-old child.

So Nico Burrell has spent nearly the entire span of
this conspiracy incarcerated, a conspiracy allegedly spent from

I43QBURs

2009 to 2016.  Correct me if I'm wrong.  He was arrested in

2009.  He spent five and a half years incarcerated.  He was

released in 2014, and re-arrested on this case in 2016.  And

when he was released, he threw himself into his passion, the

same passion that the government would ask the Court to

consider malevolent.

He's actually being sought after by record producers

and recording studios and record labels for this malevolent

music that has caused this misery according to the government.

If it's so malevolent, why is he being sought after?  It's

prevalent in society this music, whether we like it or not.

So yes, the Court should consider the offense conduct.

We've stipulated to the offense conduct, your Honor.  And, yes,

as your Honor stated, he is remorseful for his conduct.  He has

shown that.  But the Court must also consider who is Nico

Burrell -- a 25-years-young man who spent more than a third of

his life incarcerated.  Yes, through his own actions, we don't

dispute that, but that also has to be taken into consideration.

He's a young man who made a mistake, but he's

acknowledged that mistake twice:  Once in 2009 and then again

two years ago when he pled guilty on this offense.  He's not

without hope, your Honor.  He's well loved and staunchly

supported by family and friends, most of which are here today.

As you can see, the courtroom is filled.  He is genuinely a

good person.

1          Now, of course the Court could take this with a grain
2     of salt, but we provided the Court with a stack of letters from
3     friends and loved ones and family members who attest to his
4     good character, and they know about his prior convictions and
5     they know all about the charges here.  We attached to our
6     sentencing submission a video with statements from his aunt,
7     she's here today, his sister, his grandmother, who is of ailing
8     health, she is also here today.  And from his manager, Sherwin
9     Charles and from one of the producers of his videos, Alistair
10    Christopher.
11         They all attest, all of them to his incredible work
12    ethic, to his drive, to his ambition.  And not only that, you
13    have grown men talking in the videos that we submitted stating
14    that he expresses his love to him.  That is not the picture the
15    government portrays but that is the other side that the Court
16    should consider.  He has demonstrated a fierce determination to
17    change, your Honor.  And we submit that he has.  And not just
18    now during his last two years of incarceration, but before his
19    incarceration when he was released from state prison.
20         The government points to all of the videos as
21    evidence, aside from what we stipulated to in the plea
22    agreement, but there is another side to him.  And that's why
23    we're asking for the sentence we're asking for.  It's not an
24    unreasonable sentence, especially when considered with all the
25    other sentences that the Court has handed down in this case.  I

1    listed a few of the sentences in my sentencing memorandum.

2    Barffour Abeberse, number eight in the indictment, received a

3    sentence of 102 months, though he's considered to be a much

4    more violent offender in comparison to Mr. Burrell.  That

5    defendant was arrested with a loaded firearm, for which he was

6    sentenced at state to probation and which he violated twice.

7    Mr. Burrell has been on parole and was never violated.  That

8    defendant participated in a shooting at a public housing

9    project where he shot the victim in the calf.

10           THE COURT:  He was on criminal justice supervision at

11   the time of this arrest, correct?

12           MS. VARGAS:  Yes, that's correct, your Honor.

13           The other defendant participated in the beating and

14   robbery of a woman.  Participated in a brawl that led to the

15   murder of a 15-year-old.  And sold crack and was found inside

16   of an apartment where a .45 caliber pistol was recovered.

17           Mashud Yoda, number nine, his sentence was adjusted to

18   96 months.  His conduct includes that he was a fugitive in this

19   case.  He was found hiding in Ithaca after an extensive

20   government manhunt.  He was also arrested where a search

21   warrant was conducted and a pistol was recovered, and that

22   pistol was tied to the murder of Keshon Porterfield in this

23   case.  He received a sentence of 96 months.

24           We believe that the sentence we're requesting would be

25   fair in light of everything that we've presented to the Court,

I43QBURs

1    including the conduct for which he's charged, and in light of

2    all the other sentences that the Court has handed down, and the

3    Court has the latitude and the discretion to do this, to impose

4    a sentence that fits the crime and the person before the Court

5    and to take into account Mr. Burrell's troubled background, his

6    history and characteristics as well as his efforts at

7    rehabilitation.

8          With that, your Honor, unless the Court has any

9    further questions, I think Mr. Goltzer would like to address

10   the Court.

11         THE COURT:  Thank you, Ms. Vargas.

12         MS. VARGAS:  Thank you, your Honor.

13         MR. GOLTZER:  Thank you, Judge.

14         I will not be as long as Ms. Vargas who has been

15   taking the lead but there are some things that I would like to

16   address.

17         One of the really guiding factors of my own career has

18   been the work of Clarence Darrow.  And I was reading some of

19   the remarks that he made to a sentencing judge in the Leopold

20   Loeb case back in the early part of the Twentieth Century when

21   two gentlemen from very prominent and wealthy Chicago families

22   engaged in a thrill killing for the fun of it, and everybody

23   was clamoring for their death.

24         And what Darrow told the judge in substance was,

25   before you can mete out justice to what is essentially a very

1     frail piece of human clay, you have to take a look at

2     everything that's behind that frail piece of clay, the

3     civilization, parents, the grandparents, all of the motivating

4     factors.  And if you can do it, said Darrow to the judge, who

5     ultimately gave them life and not death, if you can do it,

6     Judge, you're wise.  And he concluded by telling the judge what

7     I'm going to tell you.  With wisdom goes mercy.

8            When I was appointed to this case, I was appointed as

9     learned capital counsel because the government had promised

10    that they were going to indict Mr. Burrell for a capital

11    offense.  He, unlike others in this case, has never been

12    charged with murder.  The government doesn't have a provable

13    murder.  And for the government to stand here and tell you that

14    he is the worst of the worst, the worst defendant in this case

15    is astounding to me.

16           MR. SCOTTEN:  To be clear, we were very careful not to

17    say that.  The murderers haven't been sentenced.

18           THE COURT:  You'll have a chance.

19           MR. SCOTTEN:  OK, your Honor.

20           THE COURT:  Go ahead, Mr. Goltzer.

21           MR. GOLTZER:  What the government said in its

22    memorandum that he is the worst who is to be sentenced.  If the

23    murderers haven't been sentenced, I'm unaware of that.  He is

24    not the worst of the worst to be sentenced in this case.

25           Quite the contrary.  The Supreme Court recognized not

too long ago when it said you couldn't kill people who
committed murders when they were under 18 years of age.  The
Supreme Court recognized the scientific studies that had been
done about the status of the adolescent brain, and when he shot
those shots in 2009 at the age of 16, his brain hadn't been
fully developed.  He lived a Dickensian childhood with every
conceivable kind of deprivation, and it is no wonder that at
that age when he wasn't fully developed emotionally or
intellectually, he embraced a second family, which was the
street.

          And that's not a surprise to you.  It's not a surprise
to me, who's been on too many of these cases that that gang
milieu, that gang culture takes these children in with the rap
music and the culture I prefer Brahms, quite frankly.  That
culture is counterproductive.  I accept that.  The Court
accepts it.  But it is a fact of life.  And he jumped in with
both feet when he was 16 years of age, and it wasn't a
reasonable sentence, I don't believe.  There could have been
supervision there could have been therapy.

          Instead, there was warehousing of a young man who came
out of prison in 2014 hardened, who went back out into the
street and assumed a leadership role to the extent that he did
extol them to live in the gang rap culture.  He did extol them
not to snitch, but I don't see evidence that he shot anybody
after he got out of prison.  I see evidence that he lived in a

homeless shelter, and he was able to sell a few pills, some

number of pills because he had access to a source that the

conspiracy was responsible for 8,000 pills but he was living in

a homeless shelter and penniless supported by family and

friends while he was trying to engage in a career as a

musician.

        And, yes, Ms. Vargas is right; they're mocking him for

it.  They're denigrating his intelligence.  They're denigrating

his leadership capacities.  But it is that very capacity that

has led him to be where he is at 25.  And at 25 he's a heck of

a lot different than he was at 16 or 18 or even 21 or than he

was in 2016.

        I told you before, your Honor, that when the

corrections officer said "Stop fighting, walk away," he walked

away.  He not only walked away from the fight, but he walked

away from that life.  He's not the same person today that he

was in January of 2017.  If you accept what the government is

saying about him, that everything he did to rehabilitate

himself to show genuine remorse was phony, you'd have to

believe he fooled everybody in this courtroom; that the people

who wrote letters and told you that Nico Burrell took care of

my special needs child, did good deeds in his life, tried to

take care of his grandmother, took a homeless man on the street

and gave him hope.  You'd have to believe he fooled all those

people.  You'd have to believe the people who are here from the

I43QBURs

Forward Focus group who wrote a beautiful letter on his

behalf -- and they're sitting in the third row and smiling at

me, your Honor -- you'd have to believe that those people who

deal with prisoners every day and have seen every variety of

con known to man were taken in by Nico Burrell.

        And that's simply false.  It is not true.  And they're

wrong about it.  They have constructed a pyramid.  They put

Nico Burrell at the point of the pyramid, and they say he was

the leader of the gang.  Your Honor has already sentenced other

so-called leaders of the gang.  This isn't an enterprise with

one leader.  This isn't the Bonanno crime family or Gambino

crime family.

        This is a bunch of kids living in the hood, living a

certain lifestyle that's counterproductive, and he's walking

away from the it.  That's what he's leading.  He was rapping

the life, but he wasn't telling people to kill anybody.  Do you

think he was sitting there in Clinton Correctional Facility or

in Rikers Island telling people to go kill somebody?  There's

no evidence of that in this case, and yet they had him as the

lead defendant, and that is why I was appointed.  And I'm happy

to say I didn't have to deal with a capital charge.

        But if I had to deal with a capital charge, I have

classic mitigation.  Parents deported.  A child deprived of his

loved ones.  A child living in poverty.  A child being taken

care of by a 19-year-old sister?  Classic mitigation.  It is a

1    miracle and a testament to the human spirit that he's able to

2    climb out of it and have a future.

3            In terms of 3553(a), one has to look to general

4    deterrence, specific deterrence.  He's deterred.  You think

5    you're ever going to see him here again?  No.  He's done.  He

6    hasn't fooled all the people in this courtroom.  And there is a

7    difference -- if I might take issue with something your Honor

8    said.  There is a difference between acceptance of

9    responsibility and extraordinary or genuine remorse.  I can get

10   acceptance of responsibility by saving them the trouble of a

11   trial, taking a plea, and the probation officer says give him

12   three points.  But that's not genuine remorse.

13           Genuine remorse is what's in your heart, and he feels

14   genuine remorse, and you're going to hear from Mr. Burrell.

15   And he's not here to fool you, and he's not here to fool

16   himself.  He's changed.  He will never be back in this

17   courtroom again as a violator of the law.  There's great hope

18   for this young man.  He's been rehabilitated.  He's accepted

19   responsibility.  And more than that, he is remorseful for what

20   he did.  His letter is extraordinary.  We didn't write it for

21   him.  And to mock his intelligence and to mock his leadership

22   ability is wrong, and the government's wrong.  And I respect

23   these prosecutors.

24           THE COURT:  I don't -- I'm not sure I know what you

25   mean by mocking.  It wasn't how I read it.  I heard them

1    arguing that I should understand his intelligence and his

2    leadership abilities as they contend he's used them, but --

3            MR. GOLTZER:  Perhaps mocking is the wrong word.  But

4    to the extent that they denigrated it, I think it's

5    inappropriate.  I've seen too many young men who are

6    intellectually disabled or who were what one would classify as

7    antisocial personality disorders who were hopeless, who had

8    limited prospects, who were dangers to the community, and they

9    were very difficult to represent.  And courts were tortured by

10   what they had to do because there was a hopelessness

11   surrounding them.

12           But that's not him.  I am pleased to be able to tell

13   you that you can have wonderful conversations with Mr. Burrell.

14   There's a heart to Mr. Burrell.  There's a lovingness to his

15   family and friends about Mr. Burrell.  That's why they're here.

16   Look at this courtroom.  It's a crowded courtroom.  And Kathy

17   O'Boyle wasn't fooled.  Kathy O'Boyle spent how many years?  I

18   don't know how many years you spent, Kathy.  I've known her for

19   25 years.  She's seen it all.  She was a probation officer.

20   She was a pretrial officer.  She's taught probation officers.

21   He didn't fool Kathy O'Boyle.  You can't con her.  You can con

22   me maybe, but you can't con Kathy.

23           So he's not coming back.  He's been deterred.  Nobody

24   from the outside who looks at Nico Burrell and what he's been

25   through in terms of his incarceration and the loss of his

I43QBURs

```
1    family and the separation from his grandma, who is really one
2    of the few people that he really cares so much about that he
3    can't stand the fact he's been away from her.  Everybody else
4    has survived.  No one who looks at that life at what he's been
5    through now, he's been 90 months in jail, Judge.  He's been in
6    prison 90 months over this case.
7              THE COURT:  You mean counting the 66 months.
8              MR. GOLTZER:  That's right.
9              THE COURT:  Here's the fundamental question,
10   Mr. Goltzer, which is that he commits the attempted murder in
11   2009.  He's 16.  He attempts to kill a rival gang member and
12   doesn't.
13             MR. GOLTZER:  Well, he didn't attempt to kill --
14             THE COURT:  Right.
15             MR. GOLTZER:  It was unfortunate.
16             THE COURT:  And in the course of it an innocent
17   bystander.  And that's obviously a very serious crime mitigated
18   by his age.
19             MR. GOLTZER:  I'm not minimizing it.
20             THE COURT:  And that's part of his gang activity.
21             He gets out in 2014 and then proceeds to be a leader
22   of this gang.
23             MR. GOLTZER:  Correct.
24             THE COURT:  And in the course of that, there's
25   obviously the extolling of the violence, but they're selling
```

I43QBURs

 1    drugs.  The question is, is the carrying weapons referring to

 2    2009 or is it activity after the 2014 release?

 3            MR. GOLTZER:  I believe that the government is

 4    probably contending that it's later, although I've seen no

 5    evidence of it, quite frankly.  I do not know that there's ever

 6    been the seizure of a weapon or even a bullet or a knife from

 7    Mr. Burrell.  There is an allusion in the incident in the

 8    prison to an allegation that he had some kind of object that he

 9    dropped but no one ever recovered it, and there doesn't appear

10    to be the kind of injury that would have been caused by a knife

11    or shank or a weapon.  I don't see anything about weapons other

12    than discussing them in videos, but I don't see anything that

13    he ever carried a weapon after he came out of jail.

14            THE COURT:  Let me just get an answer to that.

15            Is that stipulated conduct related to the 2009

16    incident?

17            MR. GOLTZER:  That's my understanding.

18            MR. SCOTTEN:  No, your Honor.  In fact, to the

19    contrary, the defense has already agreed the gun is after that

20    time.  That is paragraphs 7 and 7A of the plea agreement.  You

21    see, the gun is not connected to his gang membership in

22    general.  It is specifically connected to carrying that gun.

23            THE COURT:  In furtherance of the oxy.

24            MR. SCOTTEN:  Which he is dealing when he comes out of

25    prison, so there should not be any dispute.

1          MR. GOLTZER:  If I misspoke, I'll back off.

2          THE COURT:  All right.  So just thinking here.  I

3    wanted clarity on that point.  So what we've got is this very

4    serious crime happens.  He's sentenced.  He interacts with the

5    criminal justice system.  He comes out in 2014.  And what he

6    does is become a leader -- or continues to be or is a leader of

7    the BMB gang, which is a violent gang.  He's selling oxy in

8    furtherance of that conspiracy.  He's carrying weapons in

9    furtherance of that.  He's extolling gang violence.

10         So whatever lesson you're saying he's learned now, he

11   hadn't learned between 2014 and 2016 when he's incarcerated for

12   this offense.  Right?  So the government says all of -- that's

13   their version of it.  And my question is, because you say none

14   of these people can be fooled, but you can be, and the question

15   is:  What evidence do I look at to try to make this assessment?

16   Is Mr. Burrell this changed person that you're talking about or

17   does the record before me suggest five and a half years in

18   prison didn't change him and even incarceration for this crime

19   didn't change him because he assaulted a witness in another

20   case during his pretrial incarceration?  Those set of facts

21   strongly cut the other way from the picture you're describing.

22         MR. GOLTZER:  Let me address it.  When he came out of

23   prison in 2014, he had just spent over five years in a horrific

24   environment which is not really designed as it originally was

25   hoped it would be to rehabilitate.  Anyone who thinks that

I43QBURs

going to Rikers Island is going to rehabilitate somebody is

somewhat naïve in our view.  And Clinton is even more

aggravated.  I don't know if your Honor has ever had the

privilege of looking at that wall in Dannemora, New York, but

it's chilling, to say the least.

        So when he came out with some status in the hood, if

you will, and he started engaging in rap videos and tried to

support himself by selling some pills, that's not unusual.

That's not at all unusual.  But he was not the apex of a

pyramid.  I think they're overstating that terribly.  He did

what he did.  He was who he was.  But that's not who he is now.

And the fight that took place was in January of 2017.  Many,

many months ago.  It's well over a year ago.

        At the same time that this young man was doing what he

wasn't supposed to do, the evidence seems clear that he was

also helping people.  You have that in the letters, Judge.  He

was doing decent things at the same time.  He's a complex young

man.  Notwithstanding the deprivations that he suffered, he

found it in his heart to help people and give them hope.  And I

don't think even the government would contradict that.  No one

is suggesting in this courtroom that the people who wrote those

letters made it up.

        The fact of the matter is that since January of 2017,

there is nothing but an upward spiral in terms of his

development and rehabilitation.  And I think the Forward Focus

1  group is the perfect proof of that.  Of all the people in that

2  program, they chose two to be the valedictorian speakers, and

3  Nico Burrell was one of them.  So there is great hope here of

4  redemption, and there is redemption.  I believe in redemption.

5  I hope the Court believes in redemption.  You're going to hear

6  from Mr. Burrell, and you will have a chance to judge the

7  sincerity of his remarks.

8          And I hope you will find it in your heart to do what

9  we think is the right thing and give him a sentence that gives

10  him a chance to be who he is now and who can even be better.  I

11  went over his letter with him yesterday.  He changed it a

12  little bit the remarks he wants to make.  He wants to be better

13  than he is now, and now he's better than he was then, much

14  better.

15          And to the extent that the government says or implies

16  that this rehabilitation is a fraud, they're just wrong.  And I

17  don't think that it's remotely accurate to suggest that he was

18  controlling in the sense of leadership 60 or 70 gang members.

19  That's not what happened here.  I don't think it was that

20  sophisticated of an organization, that structured of an

21  organization.

22          It was a neighborhood that was in pain that is still

23  in pain, like so many neighborhoods in this City, like so many

24  gangs in this City.  He was part of it, he's sorry for it, and

25  he's not going to be part of it again.  But to give him a 20

1    year sentence with time off for the time that he already did,

2    it's just inappropriate.  It is just wrong.  It is not what he

3    deserves.  It is not who he was.  It is not who he is.

4             Thank you.

5             THE COURT:  Thank you, Mr. Goltzer.

6             Mr. Scotten, a couple of questions, and then I will

7    give defense counsel any last responses, and then an

8    opportunity for Mr. Burrell to make a statement.

9             One point that both defense counsel made was that for

10   a situation portion of the conspiracy, Mr. Burrell is

11   incarcerated.  I think that ties to a broader question, which

12   is that I would like you to point me to the facts.  I mean, you

13   talk about Mr. Burrell as a leader, and you do describe him as,

14   I don't know if you would have said the apex, but your

15   sentencing submission -- I don't want to misquote you --

16   started by saying, "Burrell is the most culpable defendant to

17   come before the Court thus far in this case."

18            MR. SCOTTEN:  That's correct, your Honor.

19            THE COURT:  I guess I would like you to help me

20   understand the government's position, put some flesh on the

21   bones of what it means to have been the leader that he is

22   stipulated to be.  How do you understand his -- what's the

23   basis for saying he's the most culpable, and what are the facts

24   in the record that help put some flesh on the bones of his

25   leadership role?

1          MR. SCOTTEN:  Sure, your Honor.

2          So I think the best way for me to start with that is

3     to just read from the PSR because, again, it's not a government

4     assertion.  I'm sure Mr. Goltzer didn't mean to contradict the

5     PSR, and he just agreed it was accurate.

6          So I'm in paragraph 25, your Honor, which is on page

7     19.  "After Burrell's release from state prison," skip the

8     date, "Burrell acted as the head of BMB and made decisions for

9     the gang, including giving leadership positions to gang

10    members."So we don't think there's a dispute that he's at the

11    apex.

12         Now, I will agree with Mr. Goltzer, this is not a

13    hierarchal organization like an organized crime family where

14    some other gang member wants to do X, he has to send it up the

15    chain, get Mr. Burrell's approval, and it comes back down.  I

16    agree that he did not have that type of control of the gang,

17    and, frankly, that is the reason, your Honor, that he is not

18    legally accountable for other murders and so on committed by

19    the gang as a street boss of a Lucchese family, for example,

20    might be.

21         What he did have was a position of authority such that

22    all other members of the gang recognized him as the most

23    senior, the person most respected.  He was able to appoint

24    other people to leadership roles.  Does that lead to a trail of

25    violence?  Absolutely.  Dominick Sherland, who murdered that

1    15-year-old boy the Court heard about in the defense's

2    submission, was that person appointed to a leadership position

3    in the gang by Nico Burrell?  Yes, he was.  Mr. Burrell

4    recruited other members.  That doesn't create violence in the

5    same way that a direct order does, but it absolutely creates

6    violence.

7            I'm overly formalizing, but essentially did he create

8    policy?  He never would have called it that.  Certainly, the

9    people who followed him wouldn't have.  Yes.  Was he the one

10   who enforced or created norms such as no snitching, fight the

11   other gang?  Absolutely.

12           THE COURT:  What paragraph do you point to for that

13   proposition?

14           MR. SCOTTEN:  So, paragraph 25 only says "made

15   decisions for the gang."  It does not specify which ones, but

16   the preemptory paragraphs, the Court is very familiar with

17   because they're in every PSR, describe what the major policies

18   of the gang were.  They also mention Mr. Burrell extensively.

19   I think he's one of the few defendants to come before the

20   Court.  He was also mentioned in the preamble because he was

21   that significant of a figure, so he's mentioned as a big suit

22   who could create other big suits.  He's mentioned as enforcing

23   the Day One concept, that is the original core that can really

24   be trusted, that won't snitch when the time comes that law

25   enforcement comes.  That's paragraph 17.

I43QBURs

1            So I do think it is very much -- your Honor, you have

2     a PSR that tells you what the gang did, what the defendant

3     specifically did in many cases, and that he was the head that

4     made decisions.  I do think that's all in the record.

5            And I think the Court's question fairly gives me an

6     opportunity to address this video issue.  I don't want the

7     Court to come away with thinking that videos are evidence of

8     leadership.  They are some evidence of leadership.  Even

9     Mr. Goltzer in his submission couldn't help but suggest that

10    videos are part of what pulls people into these gangs.

11           And it's true, if we needed to have a hearing and call

12    witnesses who could explain the powerful allure that you-too

13    presence creates that directly brings people into the gangs and

14    directly encourages rivalries, we can do that.  But I think

15    their better evidence of gang of what Mr. Burrell says.  We're

16    not having a Fatico, your Honor, so we're not going to put on

17    cooperating witnesses to talk about what Burrell said.  But you

18    don't have to because you have these videos.

19           The one we sent you we chose because it was not a

20    slickly produced video glorifying a fake robbery, which is a

21    different video.  It's just Burrell and other members of the

22    gang and he's saying things that he would say elsewhere, that

23    the PSR tells us he did:  If we see an op, we shoot them.  If

24    we see a member of the opposing gang, we shoot them.  We don't

25    snitch.  We don't even need a reason to shoot other people.  My

1   gang, my blandirs, we're killers.  We're shooters.  We brag

2   about bullets ripping through your tissue.  I'm not saying that

3   as someone who doesn't know.  I'm not Jay-Z.  I'm someone who

4   sent some bullets through people's tissue a few years ago.

5          I suppose I should also note on that, your Honor, the

6   fact Mr. Burrell was in the prison for sort of the middle of

7   the conspiracy doesn't really take him out of influence.  The

8   conspiracy is actually charged starting in 2007 when

9   Mr. Burrell was a very young man, but he was also founding the

10  gang then.  It's charged for a significant period of violence

11  from 2014 to 2016 when he comes out.  I don't see any evidence

12  of remorse.  I don't see Mr. Burrell coming forward to describe

13  who killed Jordan Jaquette (ph), still an unsolved murder

14  committed by the gang.

15         I have couple other points, but I know the Court had

16  questions.  I don't want to go into a free form rebuttal.

17         THE COURT:  You did address it a little bit.  I did

18  want to ask the government, Ms. Vargas both in the submission

19  and today pointed to individuals she thinks I should look to as

20  comparables, and I always ask the government for that here.

21         MR. SCOTTEN:  I don't really think you have that, your

22  Honor.  And the reason is, the Court has sentenced some

23  leaders, but it didn't have a lot of violence, and it sentenced

24  some very violent people but who were not leaders.  The closest

25  is McClarty.  He hasn't been sentenced yet.  If we had to

I43QBURs

1   choose the second most leadership possessing person, that would

2   be McClarty.  Other than that, I'm not sure your Honor

3   sentenced Anthony King.

4           THE COURT:  I mean, Rasheid Butler, who was a leader

5   of the Triple M subset, he had his underlying acts to which he

6   pled for the RICO conspiracy included attempted murder of a

7   rival gang member.

8           MR. SCOTTEN:  We do think it's very important that

9   he's a subset leader.  I think the Court gave him a fairly

10  significant sentence.

11          THE COURT:  I sentenced him to 151 months.

12          MR. SCOTTEN:  Right.  He was in fact a leader of a

13  subset of the gang, which makes him, I think, markedly less

14  culpable than Mr. Burrell.  Certainly very culpable, we're not

15  arguing with the Court's sentence there.  I'm sure we asked for

16  more than that.  But there's a difference between leading the

17  entire gang and really being a sort of policy-setting figure as

18  Mr. Burrell, someone who could appoint other leaders and make

19  decision and being the violent leader of a subset of the gang.

20          THE COURT:  I suppose that's true on a theoretical

21  level, but I think it depends on how sort of loose and

22  unstructured the structure of the gang was.

23          MR. SCOTTEN:  Again, your Honor is right -- well, you

24  know, if we were dealing with an organized crime family, and

25  Mr. Butler was a captain and Mr. Burrell was the head, it would

1    be easier to parse that out.  I guess the point here is that

2    Burrell's actions served to influence throughout the entire

3    gang.  To the extent you are considering leadership in terms of

4    things like making decisions to do terrible destructive

5    antisocial things, Mr. Burrell's leadership authority is having

6    wider impact than Mr. Butler.  To the extent you're considering

7    the founding of the gang and the appointment of other leaders,

8    Burrell can have a much wider influence.  He's still at the

9    top, even if he is not the top in an org chart kind of way, his

10   influence is still significantly greater than Butler's.

11            THE COURT:  All right.

12            MR. SCOTTEN:  The other couple points I want to make

13   very quickly, your Honor, I am not going to belabor the point

14   about the facts because I think the Court has it.  There are a

15   lot of facts that show no rehabilitation, continuous return to

16   violence.  I'm not mocking or denigrating any of the facts that

17   show talent, ability, motivation.  I just think that's all the

18   Court has actually seen.  And I think that was always there

19   from the beginning.

20            I don't think there's any evidence, not an ounce of

21   Mr. Burrell getting out of jail and abandoning the gang life.

22   Yes, he helps his family, his friends.  He's inspirational., he

23   would hardly be the first criminal leader to come before this

24   Court who took care of his family, who looked out for his

25   friends, who inspired people.  That's part of what a good

1    leader is.  People follow good leaders.  I'm not denying

2    Mr. Burrell is a good leader.  But so far he has shown

3    repeatedly he will put that to terribly destructive ends, and I

4    do think the Court should consider that.

5         The last two points, your Honor, I want to make sure

6    the record is clear on this assault that occurred.  It keeps

7    getting referred to as a fight.  It's not a fight.  I think we

8    gave the Court the testimony.  The testimony describes the

9    video.  We decided not to put a video in evidence and also not

10   to argue about that.  But in short what happens is the victim

11   is seen at a phone bank.  The other member of the assault, the

12   second person, passes by Burrell, signals to him "Come on.

13   Let's go get this guy."  And then two men attack one man.  They

14   begin beating him.  The guards intervene.  And, yes, Burrell

15   freezes.

16        After -- you can see this on the video and it's

17   described in testimony we gave the Court.  After, he very

18   carefully turns to another inmate and throws him an object.

19   Reasonable decision?  Yes.  Evidence of rehabilitation?  No.

20        And then finally, your Honor, this is not 3553(a)

21   factor, but I want to make it absolutely clear.  The

22   government's current understanding of the parties' position is

23   that both parties are allowed to make the arguments they made

24   today and that neither party believes the other would be in

25   breach.  I want to be very clear about that and give the

I43QBURs

1   defendants any opportunity they want to try to get

2   Mr. Burrell's plea back because now is the time to do it; not

3   after a sentence is imposed.

4               MR. GOLTZER:  May I have two minutes?

5               THE COURT:  You may.

6               MR. GOLTZER:  Thank you.

7               I would like to pose a rhetorical question to the

8   Court.  If the government is right that Mr. Burrell was the

9   leader of the pack, how could it be that from 2009 to 2014 this

10  loose enterprise was able to function in his absence?  How

11  could it be that people were getting shot; that crack, which he

12  never pled to was being sold; that people were being recruited;

13  that policies were being made?  How could it be that any of

14  that could have happened without the kingpin?

15              It's obvious that this gang or this loosely

16  put-together enterprise was fully capable and did function

17  without Mr. Burrell for years and then to the extent that the

18  government needs Carlo Gambino, they've chosen Mr. Burrell and

19  this other fellow.  But it's a fable.  There's no evidence of

20  it.  They have a snitch.

21              MR. SCOTTEN:  I think we may need a hearing.

22              MR. GOLTZER:  We don't need a hearing.  The government

23  has had every opportunity to put in whatever it wanted to put

24  in, and what's in the presentence report, the PSR in terms of

25  the narrative, is the government's version of events.  We're

I43QBURs

1    not arguing that he wasn't a leader.  We've addressed that, but

2    they've overstated it.

3              THE COURT:  Unless you are asking for a hearing, it's

4    no longer just the government's version of events.  It's the

5    factual record which I've adopted for purposes of the

6    sentencing proceeding.

7              MR. GOLTZER:  And I mentioned to the Court, and I say

8    this most respectfully, there is leadership and then there's

9    leadership, which you've sentenced several leaders.  There are

10   other leaders in the case.

11             THE COURT:  I get that, but in terms of the facts I

12   rely on to make an assessment of what his role as a leader is,

13   you're not asking for a factual hearing.

14             MR. GOLTZER:  No.  But I'm saying, and I think it's

15   accurate, that they have overstated it.  The government just

16   said it's a loose -- it's loose.  Did I hear that correctly?  I

17   think I heard that correctly.

18             THE COURT:  Yeah.

19             MR. GOLTZER:  That it is not as hierarchal as the

20   Lucchese crime family.  It's just not the same.  To the extent

21   that they allege these gangs are enterprises, that's fine, we

22   understand that.  To some extent, they're loose.

23             THE COURT:  Again, not just alleged; pled to here.

24             MR. GOLTZER:  I understand that.

25             THE COURT:  I want the record to be clear.

                                                                        59

I43QBURs

1          MR. GOLTZER:  I'm not backing off, but as I mentioned

2     earlier, when we were addressing questions about the report,

3     there are degrees and there are nuances and it's being terribly

4     overstated and what's being terribly understated by the

5     government is his rehabilitation and the fact that he's

6     changed.  That's all I'm saying.  And that's all I want the

7     Court to know, and I hope you accept that.

8          THE COURT:  I do.  Mr. Goltzer, I do want to be clear,

9     I think we have a clear answer to this, but if there is any

10    contention that the government has breached the plea agreement,

11    now is the time to make that contention and make any request

12    with respect to that.

13         MR. GOLTZER:  No, there is not.  We think that their

14    argument is misguided, but that's a different issue.  But as

15    far as a legal conclusion of breach, we're not going there.

16         THE COURT:  All right.  Thank you.

17         MR. GOLTZER:  Thank you.

18         THE COURT:  With that, Mr. Burrell, I have read your

19    letter, sir, but I want to give you an opportunity to make a

20    statement here in court.  You don't have to, but if you'd like

21    to, you may do so now.

22         THE DEFENDANT:  Good morning, Judge Nathan.

23         First I want to tell you the steps I did when I

24    started making music.  I started writing music in 2013 in Bain

25    Correctional Facility.  When I came home to find my music in

1    2014, I took that music to my manager.  My manager been

2    managing people that does music.  He took the music and brought

3    it to a producer.  That producer looked me in my face and told

4    me, "If you rap like this, I could give you a million dollars

5    like Jay-Z.  I could get you a million dollars like Rick Ross.

6    I could give you a million dollars like Meek Mill.  I know my

7    lyrics is not good.  My lyrics is not positive.  But that was

8    the material that was being made at the time.  That's the

9    material that I looked at the You Tube, and they gained a

10   million views.

11           Now I got a chance.  I got a million views on You

12   Tube.  I got the record labels asking to ask when I'm coming

13   home, and when I'm coming home, I would like to sign him.  This

14   is my chance off of that music.  So I know that you don't

15   understand.  The ADA don't understand why the music is violent

16   or why I choose to rap that way, but that's why I did it.

17   Jay-Z got locked up for aggravated assault and drugs, but he

18   still rapped and overcame that, and that's what I want to do.

19           But I want wrote something I want to read to you

20   that's in front of me.

21           THE COURT:  Go ahead.

22           THE DEFENDANT:  When my mom got deported, it hit me

23   like a ton of bricks.

24           I was a 15-year-old boy who thought I was a man, but

25   made poor decisions and made excuses for my actions.  And even

though I was supposed to be there for my family at the time
they needed me the most, I let them down by going to jail.

Well, I'm no longer that person.  And I haven't been
since I was 18-years-old.  My name been dragged through mud
from the news and ADA at bail and sentencings and hearings
making me a character out of the latest gangland book even
though I only been locked up one time in my entire life, and
even though I only been home 20 months in the last nine years,
or even that I maintained -- and maintained a crack spot when I
was living in a shelter and sleeping on my sister's couch,

Judge Nathan, I came back from my six-year bid and
took my pain and frustration and put it into my music to make
something out of myself.  To erase the feeling of feeling like
a disappointment.  To erase the feeling that I gave up on my
family and disappointed my family.

It excites me when I hear my manager tell me that a
major record label wants to sign me or when I hear my music on
the radio.  It makes me feel proud of myself.  That I could
finally use my music to get my family out of cursed situations,
like my grandmother not being able to afford medicine or my
aunt getting laid off from her job because she can't pay the
rent.

But I'm locked up again, Judge Nathan.  I hear y'all
ask what's the difference between now and five years ago --
five and a half years ago.  The difference is my grandmother is

1    about to leave me, Judge Nathan, and I can't help her right

2    now.  I can't even give her a kidney right now if I wanted to.

3    I can't.  Judge Nathan, give me a chance, man.  Give me a

4    chance to prove them wrong.  Give me a chance to prove

5    everybody wrong.  Give me a chance to be a brother to my

6    sisters, a cousin to my cousins, an aunt to my nephew -- a

7    nephew to my aunt, a grandson to my grandmother, a son to my

8    mother, an uncle to my nieces, and most important, my nephews

9    so they don't have to know what an MCC cell looks like.  They

10   don't have to go running to the street for guidance and love

11   like I did growing up at 16-years-old, Judge Nathan.  Give me a

12   chance to take my family out of poverty and break the cycle

13   that been bringing us down these last 12 years.

14          I made some mistakes, and, Judge, that's in my past.

15   And I want to say I'm sorry for what I did to my family, to the

16   community, to the Court.  I grown out of it.  I grown out of

17   that crazy part of my life.  I'm now who I am, and I hope to be

18   better than I am.  Judge Nathan, I'm just asking for a chance.

19   Thank you very much.

20          THE COURT:  Thank you, Mr. Burrell.

21          Counsel, anything further?  Any reason why sentence

22   cannot be imposed at this time?

23          MR. SCOTTEN:  No, your Honor.

24          MR. GOLTZER:  No, your Honor.

25          MS. VARGAS:  No, your Honor.

I43QBURs

| | |
|---|---|
| 1 | THE COURT:  As I've stated, the guideline range |
| 2 | applicable to this case is 135 to 168 months' imprisonment. |
| 3 | Under the Supreme Court's decision in *Booker* and its progeny, |
| 4 | the guideline range is only one factor that the Court must |
| 5 | consider in deciding the appropriate sentence. |
| 6 | I'm also required to consider the other factors set |
| 7 | forth in 18 U.S.C. Section 3553(a).  These include the nature |
| 8 | and circumstances of the offense, and the history and |
| 9 | characteristics of the defendant, the need for the sentence |
| 10 | imposed to reflect the seriousness of the offense, to promote |
| 11 | respect for the law, and to provide just punishment for the |
| 12 | offense, to afford adequate deterrence to criminal conduct, to |
| 13 | protect the public from further crimes of the defendant and to |
| 14 | provide the defendant with needed vocational or educational |
| 15 | training, medical care or other treatment. |
| 16 | I am to take into account the kinds of sentences |
| 17 | available, as I said, the guideline range, any pertinent policy |
| 18 | statement, and the need to avoid unwarranted sentence |
| 19 | disparities among defendants with similar records who have been |
| 20 | found guilty of similar conduct. |
| 21 | I am required to impose a sentenced sufficient but no |
| 22 | greater than necessary to comply with the purposes I've just |
| 23 | described. |
| 24 | I have given substantial thought and attention to the |
| 25 | appropriate sentence in this case in light of the 3553(a) |

I43QBURs

1    factors and the appropriate purposes of sentencing as reflected

2    in that statute.

3            Mr. Burrell stands convicted of an extremely serious

4    offense.  He pled guilty to participating in the racketeering

5    conspiracy.  He was the leading member of the violent street

6    gang BMB that operated in the Bronx.  BMB trafficked in

7    narcotics including oxycodone, crack cocaine, marijuana and

8    other prescription pills.  Members of the gang and associates

9    kept firearms and engaged in acts of violence, including

10   shootings, stabbings and assaults.  BMB has a violent cultural

11   norm against snitching or cooperating.  This gang ravaged the

12   areas it occupied with its dangerous drugs and violence.  It

13   did real damage to the neighborhood.

14           As noted, Mr. Burrell was the leading member of this

15   gang.  His first major act took place in 2009 when he shot a

16   rival gang member.  And in the course of that shooting, an

17   innocent bystander was also shot.  He faced punishment.  He

18   interacted with the criminal justice system and faced

19   punishment for that.  He was sentenced to five and a half years

20   of prison.

21           Upon his release, he did resume his BMB activities, as

22   it states in paragraph 25 of the PSR.  After his release from

23   prison in 2014, Mr. Burrell acted as the head of BMB and made

24   decisions for the gang, including giving leadership positions

25   to gang members.  His activity individually included selling

narcotics, carrying weapons.  He led the gang and he extolled
the violence of the gang, and in the course of doing so
fostered the gang culture of enforcement against snitches and
rival gang violence.

I want to be clear, I am not sentencing Mr. Burrell
for his music and for his expression contained in that music.
I appreciate Mr. Burrell's talent, and I recognize that the
music he creates and makes has an expressive element, and he's
not being punished for that.  But I do take into account in
conjunction with the stipulation to the leadership role that
there was a fostering and extolling of the violent gang culture
that is communicated by Mr. Burrell during the course of some
of that activity and other.

It's difficult to not take as a significant fact that
despite the punishment he received in 2009 and serving five and
a half years for that, that he returned to the gang and
continued in a leadership role which does suggest the need for
a very substantial punishment.

Also very concerning is that even upon incarceration
here for this instant offense, the violent activity did
continue, and he committed an aggravated assault in prison
against someone who is a witness involved in a separate federal
prosecution, seemingly acting out on the gang culture of
engaging in acts of violence against cooperators, which is very
troubling.

1          I indicated that I was including that in my guidelines

2    calculation.  I said it before and I'll say it again, I want to

3    make clear even if I hadn't, I would take it into account as

4    part of the 3553(a) factors.

5          Mr. Burrell, it's interesting -- as you just said,

6    Mr. Burrell, you don't have an extensive criminal history, you

7    were incarcerated for your other known conviction at the age of

8    16, and you served five and a half years.  You didn't have a

9    lot of time between your release there and incarceration here,

10   so it's hard to know what to make of that record, except two

11   things:  It's not an extensive criminal history, to be sure,

12   but the criminal history that exists is both extremely serious

13   and didn't serve as a sufficient deterrence to your leadership

14   involvement in the gang activity here.

15         Given Mr. Burrell's leadership of this destructive

16   gang, the level of violence that Mr. Burrell has himself

17   participated in, the extolling of the violence of the gang and

18   the continuation of violent activity after prior incarceration

19   and even after incarceration here, I have no doubt that a very

20   serious sentence is warranted to protect the public, to impose

21   just punishment, to promote respect for the law and to deter

22   Mr. Burrell and others.

23         Of course I must, and I do, take into account the

24   history and characteristics of this defendant.  Mr. Burrell

25   pled guilty and has accepted responsibility for his conduct.

I43QBURs

He's obviously faced substantial obstacles and difficulties

during the course of his young life, better discussed at length

in the mitigation report and the defense submission and as

discussed here today, obvious tremendous instability and

separation from loved ones following the deportation of his

parents and the difficult life circumstances of homelessness

and the like.

He has made admirable efforts at rehabilitation during

incarceration here.  At least there's indications of that:

Involvement in a variety of programs, including Focus Forward

and obviously seen by the facilitators of that program who've

written me and who are here today as someone with leadership

ability and potential.  He's obviously a very bright young man

with leadership ability.  He's well read.  You've read more

than me in the last couple of years, Mr. Burrell, and I'm glad

to see it.  You're a bright man, and that intelligence is

reflected both in your writing, in your speaking, obviously in

your speaking ability that was identified by the Focus Forward

program, and in the writing that constitutes your music.

The question going forward, the fundamental question

here is whether Mr. Burrell will use those leadership

abilities, those skills, his intelligence as he has in the past

toward criminal conduct and criminal organization or toward

creating a better life for himself and his community.  It's a

mixed record.  Obviously, there are indications from the

I43QBURs

letters I've received and the steps taken in incarceration that

those skills can be put to good use, but for the reasons I

indicated earlier, there are troubling facts which suggest that

if that real change has come, it has come only very recently

and not after prior incarceration and not even after

incarceration here.  But I do take those facts into account.

I will sentence Mr. Burrell to avoid unwarranted

sentence disparities.  I think it's right to say that he is

different than many of the defendants I have sentenced.

There's violence here, which is of great concern to me,

although it was when he was only 16, but I'm obviously

concerned about whether it's the apex or not, the high level of

leadership in the gang that's been stipulated to, and I think

it does at least make him comparable with someone like Rasheid

Butler who I sentenced and others who helped facilitate the

gang in important ways who provided leadership, who set

policies, who extolled violence and enforced that cultural

norm.

I reject the government's request to sentence with an

upward variance.  I don't believe that the record here

significantly establishes a level of culpability that well

beyond others who I've sentenced, and I think there is more of

a glimmer of hope that the rehabilitation that's been presented

can be real and actualized in the future.

I also reject the defense's request for a downward

I43QBURs

1   variance.  I actually think here that the guideline range

2   appropriately captures the level of culpability as well as the

3   history and characteristics of the defendant that come together

4   with a complicated and quite mixed picture with uncertainty as

5   to the future but the possibility, as Mr. Goltzer said, of

6   redemption.

7          But the punishment must be sufficient in light of the

8   level of violence, the leadership role, the destructive nature

9   of this gang, the extolling of violence and the continuation of

10  violence that has occurred despite incarceration and prior

11  punishment.  In sum, I have concluded that a guideline sentence

12  is appropriate for the reasons that I've indicated.  I will

13  upon stating my sentence subtract the approximately 66 months

14  for time served pursuant to 5K2.23.

15         Mr. Burrell, I will ask you to please rise as I state

16  your formal sentence.  It is the judgment of this Court that

17  you be sentenced to a period of 150 months, that's one five

18  zero, to be followed by a period of three years of supervised

19  release, and I will, as I said, subtract 66 months for time

20  served pursuant to 5K2.23, which produces a sentence of

21  approximately 84 months, to be followed by a period of three

22  years of supervised release.

23         You may be seated, sir.

24         During your term of supervised release, the standard

25  conditions of supervision shall apply.

I43QBURs

1          In addition, you will be subject to the following

2     mandatory conditions:  You shall not commit another federal,

3     state or local crime.

4          You shall not unlawfully possess a controlled

5     substance.

6          You must refrain from any unlawful use of controlled

7     substance and submit to one drug test within 15 days of release

8     from imprisonment and to periodic drug tests as determined by

9     the court and probation.

10          As I said, you must comply with the standard

11     conditions of supervision which are outlined on pages 39

12     through 40 of the PSR.

13          In addition, you will be subject to the following

14     special conditions:

15          You will be subject to the search term that's outlined

16     on page 40 of the PSR.  Specifically, you must submit your

17     person, residence, place of business, vehicle, and any property

18     or electronic devices under your control to a search on the

19     basis that the probation officer has reasonable suspicion that

20     contraband or evidence of violation of the conditions of your

21     supervised release may be found.

22          Also, as indicated in the PSR, I'm imposing a special

23     condition that you enter and complete an education and/or

24     vocational training program, which includes preparation for the

25     GED and as directed by the court and probation, and I will pay

I43QBURs

1    attention during your period of supervision to both education

2    and employment.

3        I do recommend that you be supervised this your

4    district of residence.

5        I will waive the fine because I don't believe that you

6    have the ability to pay the fine.

7        I am imposing a mandatory special assessment of $100

8    which shall be due immediately.

9        Does either counsel know of any legal reason why the

10   sentence should not be imposed as stated?

11       MR. SCOTTEN:  No, your Honor.

12       MR. GOLTZER:  No, Judge.

13       THE COURT:  The sentence as stated is imposed.

14       I do find that the sentence is sufficient but not

15   greater than necessary to satisfy the sentencing purposes that

16   I described earlier.

17       As I indicated, and I will just state formally, that

18   even had I not imposed the upward departure pursuant to 5K2 --

19   who can remind me?

20       MR. SCOTTEN:  I think it is 5K2.0 --

21       THE COURT:  5k2.0(a)(2)(A).

22       MR. SCOTTEN:  Yes, your Honor.

23       THE COURT:  Even if I had not imposed the upward

24   departure pursuant to that, I would have arrived at the same

25   sentence pursuant to the 3553(a) factors.

I43QBURs

1          Mr. Burrell, when you are released and on supervised

2    release, you will have the guidance and support of the

3    probation department.  As you reestablish your day-to-day life

4    during your period of supervised release, please take advantage

5    of these resources as the people in probation are committed to

6    helping you succeed.

7          That said, I must caution you that you must comply

8    strictly with all of your conditions of supervised release.  If

9    you are brought back before me for a violation of those

10   conditions, I may sentence you to another term of imprisonment,

11   and I hope and expect you won't put me to that decision.

12         Counsel, are there any requests regarding designation

13   and the like?

14         MR. GOLTZER:  Yes, your Honor.  We would request that

15   you recommend to the Bureau of Prisons a designation to a

16   facility as close as possible to the Metropolitan New York area

17   to facilitate further contact with family and friends.

18         THE COURT:  I do make that recommendation for

19   placement in a facility as close to New York City area as

20   possible to help facilitate maintenance of ties with

21   Mr. Burrell's family.

22         Mr. Scotten, are there any remaining counts or

23   underlying indictments that need to be dismissed at this time?

24         MR. SCOTTEN:  There are, your Honor, and the

25   government moves to dismiss them.

I43QBURs

1          THE COURT:  They are dismissed.

2          Mr. Burrell, I'm required to inform you of your

3    appellate rights.  To the extent you have not given up your

4    right to appeal your conviction and your sentence through your

5    plea of guilty and the agreement that you entered into with the

6    government in connection with that plea, you have the right to

7    appeal.

8          If you are unable to pay the cost of an appeal, you

9    may apply for leave to appeal in forma pauperis, meaning you

10   don't have to pay any filing fee.  The notice of appeal must be

11   filed within 14 days of the judgment of conviction.

12         Counsel, is there anything else that I can address at

13   this time?

14         MR. SCOTTEN:  No.  Thank you, your Honor.

15         MR. GOLTZER:  No.  Thank you, Judge.

16         MS. VARGAS:  No, your Honor.

17         THE COURT:  My thanks to counsel for their advocacy.

18         Good luck to you, Mr. Burrell.

19         We're adjourned.

20         (Adjourned)

21

22

23

24

25